GEORGE C. KORNEGAY v. CITY OF GOLDSBORO ET AL.

(Filed 1 December, 1920.)

**1. Constitutional Law—Amendments— Municipal Corporations— General Laws.**

Sec 1, Art. VIII, of our State Constitution, requiring that the General Assembly shall provide by general laws for the chartering and organization of all corporations and for amending their charters, except charitable, etc., corporations, refers to private or business corporations, and not to public or *quasi*-public corporations acting as governmental agencies, such as cities, counties, towns, and the like.

**2. Same—Statutes.**

In the interpretation that sec. 1, Art. VIII, of our Constitution refers to private or business, corporations, and not to municipal corporations as governmental agencies, the section should be construed in connection with sec. 2, dealing with "dues from corporations"; sec. 3, defining corporations as including "associations and joint stock companies," and it should be noted that if sec. 4 (properly belonging in Art. VII) included corporations as governmental agencies, it would be meaningless.

**3. Same—Special Acts—Counties.**

An act which relates to all municipal corporations of a county, including cities, towns, townships, and school districts, is not a "special act" within the intent and meaning of sec. 1, Art. VIII, of our State Constitution.

**4. Same—Local and Private Acts.**

Construing sec. 1, Art. VIII, of our Constitution, in connection with the amendments of 1916, and the related subject-matters in sec. 2, dues from corporations, sec. 3, defining corporations as joint stock companies, and sec. 4, that its subject-matter shall be legislated upon by general laws, excluding municipal corporations from such positive inhibition, except changing the names of cities, incorporated towns, etc.: *Held*, the legislative intent was to leave it to the discretion of the Legislature to enact special acts as the needs of municipal corporations may require, with the reservation as to changing the names; and the positive restriction as to "local, private, or special acts," applies to business corporations.

**5. Constitutional Laws—Statutes—Repealing Acts—Legislative Opinion.**

While the preamble to the Municipal Finance Act of 1917 evidences the opinion that the provisions of the amendments to the Constitution adopted at the election of 1916 was mandatory as to a general law affecting municipal corporations or governmental agencies, this preamble was repealed by the act of 1919, showing that the later Legislature construed the amendment as applying only to private or business corporations, with the exception stated, and the opinion of the Legislature may be considered by the courts in passing upon the meaning of the Constitution.

**6. Statutes— Subsequent Statutes — Legislative Powers — Constitutional Law.**

A legislative enactment cannot control subsequent Legislatures upon the same subject when within the powers conferred by the Constitution.

**7. Statutes—Related Statutes— General Statutes— Repugnancy— Exceptions.**

Legislative acts on the same subject are construed so as to be reconcilable when this can be done by fair and reasonable intendment, and a special act will control in its intent a general law, and held to be an exception when necessarily repugnant thereto.

**8. Constitutional Law—Local Statutes—Counties—Bonds—Special Privileges.**

A special enactment applying to the municipal or governmental agencies within a county allowing them to sell their bonds at less than par, in an emergency, is not in conflict with sec. 7, Art. I, as allowing special privileges under a general statute requiring such corporations not to sell their bonds at less than par.

**9. Constitutional Law—Statutes—Courts.**

The courts may not declare an act void except upon constitutional grounds.

**10. Usury—Municipal Corporations—Bonds—Sales—Chattels.**

Usury laws may be changed at the will of the Legislature, and an act authorizing municipalities in a certain county to sell bonds for less than

par is not objectionable as being in conflict with a general law applicable to the State; and especially so when the bonds in question have been sold to the best advantage to a purchaser, thus being dealt with as a sale of a chattel.

**11. Constitutional Law—Discrimination—Municipal Corporations—Bonds —Local Laws—General Laws.**

It is not objectionable, or in contravention of our State Constitution as discriminatory, for the Legislature, owing to unusual or compelling local conditions, to permit municipalities within the limits of a certain county to sell their bonds for less than par when the same privilege is not granted in other counties.

**12. Municipal Corporations— Bonds— Sales— Notice— Advertisement— "Financial Paper."**

A newspaper of general circulation regularly publishing news relating to financial matters, and notices of proposed sales of municipal bonds, is within the intent and meaning of a statute requiring that a certain notice of the sales of such bonds be published "in a financial paper or trade journal."

**13. Municipal Corporations—Bonds—Private Sale—Public Sale—Sales.**

Where an issuance of municipal bonds has met the constitutional and statutory requirements, a sale thereof is not void for the reason they were sold at a higher price at a private sale than was obtained at previous offers to sell at public sales.

CLARK, C. J., and BROWN, J., dissenting.

APPEAL by plaintiff from *Daniels, J.,* on a controversy submitted by action, from WAYNE, heard 7 October, 1920.

This is an action to restrain the sale of certain municipal bonds, the plaintiff alleging that the act of the General Assembly authorizing the sale of the bonds is unconstitutional and void.

The important and material facts involved in this controversy are:

1. That the city of Goldsboro, being indebted for public improvements, prepared to issue bonds under the Municipal Finance Act for sale in order that the proceeds might be used to pay said indebtedness, which consists of $150,000 in favor of the Equitable Trust Company of New York, by notes dated 2 June, 1920, and due 2 December, 1920; $75,000 in favor of the Equitable Trust Company of New York, by notes dated 1 September, 1920, and due 1 February, 1921; $75,000 in favor of J. S. Bache & Company of New York, by notes dated 14 September, 1920, and due 14 September, 1921; $41,661 in favor of Peoples Bank and Trust Company of Goldsboro, now due; $42,500 in favor of Wayne National Bank of Goldsboro, now due; $25,000 in favor of the West Construction Company, due within two months, all of which debts were contracted for the purpose of securing money with which to pay outstanding contracts entered into by the city prior to August, 1920.

2. That the provisions of the finance act were complied with, and the bonds were ready for sale and delivery to the purchaser.

3. That the sale of the bonds was advertised twice, but no sale was made, because no bidder offered to pay par for the bonds.

4. That these conditions existed when the General Assembly met in Special Session in 1920, when an act was passed authorizing the cities, towns, townships and school districts in Wayne County to sell bonds at less than par, "Within four months after the ratification of this act, for the purpose of paying indebtedness heretofore incurred and now due or to become due within six months, or for the purpose of paying the cost of public works, improvements, or properties for the making or acquisition of which an outstanding contract has heretofore been entered into by the city, town, township, or school district, as the case may be."

5. That the indebtedness of the city for which bonds are offered for sale comes within the description in said act.

6. That pursuant to said act said bonds have again been offered for sale, and they will be sold at less than par if no better bid is offered, the right to reject all bids being however reserved.

That on 14 October, 1920, and since the institution of this suit, after advertising in the *Goldsboro Daily Argus, The Raleigh News & Observer, The Bond Buyer of New York,* the city opened bids for said bonds, the best bid received for said bonds pursuant to said advertisement being less than ninety-six. That the board of aldermen rejected all of said bids, and on the following day sold said bonds to the Wayne National Bank of Goldsboro at ninety-six and accrued interest, the Wayne National Bank acting as agent in said purchase for New York and Toledo bond buyers.

That said bonds were duly executed, and were in New York City at the time of the sale; that delivery of the bonds was to be made in New York City; that payment of both principal and interest of the bonds are to be made in New York City.

That there is no intent to evade the usury laws of this State, but in good faith to meet the urgent, necessary, and immediate needs of the city in the sale of said bonds.

That unless the city can legally deliver and receive payment for said bonds there is an immediate and eminent danger that the city will have to default in the payment of its obligations.

His Honor refused to restrain the sale of the bonds, and the plaintiff excepted and appealed.

*Dickinson & Freeman for plaintiff.*
*D. C. Humphrey for defendant.*

ALLEN, J.   The plaintiff raises several constitutional questions, which we will consider in their order, first laying down the rules formulated by the experience of the past as safe guides when an act of the legislative branch of the Government is attacked upon the ground that it violates some provision of the Constitution.

"The power of the General Assembly to pass all needful laws, except when barred by constitutional restrictions, is plenary." *Shelby v. Power Co.,* 155 N. C., 196.

"Every presumption is in favor of the validity of an act of the Legislature, and all doubts are resolved in support of the act.   In determining the constitutionality of an act of the Legislature, courts always presume in the first place that the act is constitutional.   They also presume that the Legislature acted with integrity and with an honest purpose to keep within the restrictions and limitations laid down by the Constitution." *Lowery v. School Trustees,* 140 N. C., 40.

The right to declare an act unconstitutional "Should be exercised sparingly, and the conflict between the fundamental law and the legislation should be manifest, and clear beyond any reasonable doubt.   We should endeavor, by the use of all reasonable logic, to harmonize the two, and only resort to the power as a last expedient, where our plain duty requires us to exercise it in order to preserve the supremacy of the Constitution." *Johnson v. Board of Education,* 166 N. C., 472.

"It is a well recognized principle of statutory construction that 'A court will not adjudge an act of the Legislature invalid unless its violation of the Constitution is, in their judgment, clear, complete, and unmistakable.'   Black Court Law, p. 61.   And that as between two permissible interpretations, 'That construction of a statute be adopted which will uphold the law.'"   *Bonitz v. School Trustees,* 154 N. C., 379.

The courts have no power to declare an act unconstitutional because "it is opposed to the spirit supposed to pervade the Constitution," or "is against the nature and spirit of the Government," or "is contrary to the general principles of liberty," or "because they may be harsh and may create hardships or inconvenience," or "upon the grounds of inexpediency, injustice, or impropriety," or "because not wise or against public policy."

"The courts are not the guardians of the rights of the people against oppressive legislation which does not violate the provisions of the Constitution. . . .   The propriety, wisdom, and expediency of legislation is exclusively a legislative question and the courts will not declare a statute invalid because in their judgment it may be unwise or detrimental to the best interests of the State. . . .   The only question for the courts to decide is one of power, not of expediency, and statutes will not be declared void simply because, in the opinion of the Court, they are unwise."   6 R. C. L., 104, *et seq.*

"The Legislature, being familiar with local conditions, is primarily the judge of the necessity of such enactment, the mere fact that a court may differ with the Legislature in its views of public policy, or that judges may hold views inconsistent with the propriety of this legislation in question, affords no ground for judicial interference, unless the act is unmistakably in excess of legislative power." *McLean v. Arkansas,* 211 U. S., 539.

The legislative construction of a statute, while not binding on the courts, "is entitled to great weight." *Sash Co. v. Parker,* 153 N. C., 134.

Let us then see not whether the statute passed at the Special Session of 1920 authorizing the sale of these bonds at less than par is wise, or in accordance with the best public policy, but is its unconstitutionality "clear, complete, and unmistakable," the rule approved by *Hoke, J.,* in the *Bonitz case,* or is it "manifest and clear beyond any reasonable doubt," which is stated as the correct guide by *Walker, J.,* in the *Johnson case,* because this is the test, and unless we can so say, resolving doubts in favor of the statute, we are required to uphold and sustain it.

The plaintiff contends:

1. That the act passed at the Special Session 1920, authorizing a sale of the bonds at less than par, is in conflict with Art. VIII, sec. 1, of the Constitution, which provides: "No corporation shall be created, nor shall its charter be extended, altered, or amended by special act, except corporations for charitable, educational, penal, or reformatory purposes that are to be and remain under the patronage and control of the State; but the General Assembly shall provide by general laws for the chartering and organization of all corporations, and for amending, extending, and forfeiture of all charters, except those above permitted by special act."

The answer is that the defendant is a public corporation, and sec. 1 of Art. VIII "would seem clearly to have reference to private or business corporations, and does not refer to public or *quasi*-public corporations acting as governmental agencies." *Mills v. Comrs.,* 175 N. C., 219, approved on this point at this term in *Dickson v. Brewer, ante,* 403.

If argument was needed in support of this authority it is found in the fact that the section is in an article, entitled "Corporations other than municipal," section 2 deals with "dues from corporations," section 3 defines corporations as including "associations and joint-stock companies," circumstances referable naturally to private corporations, and if section 1 includes public corporations, section 4, which properly belongs in Article VII, serves no purpose.

Again, section 1 only prohibits the enactment of a "special act," and an act applicable to all the municipal corporations of Wayne County, including cities, towns, townships and school districts, is not special.

In *Williams v. Comrs.*, 119 N. C., 520, approved in *Herring v. Dixon*, 122 N. C., 423, and in *R. R. v. Cherokee County*, 177 N. C., 92, it was held that a statute authorizing a special county tax for the purpose of maintaining public ferries, public roads, and meeting other current expenses of Craven County, was not for a special purpose within the meaning of sec. 6, Art. V, of the Constitution. In *Brown v. Comrs.*, 173 N. C., 598, that "The amendment of 1916 to our Constitution, Art. II, sec. 29, prohibiting the passage by the General Assembly of local, private, or special acts 'authorizing the laying out, opening, altering, maintaining, or discontinuing of highways, streets, or alleys,' does not include within its meaning an act authorizing a county to issue bonds for the highways of a township," and the same conclusion was reached in *Mills v. Comrs.*, 175 N. C., 216, in which an act authorizing an issue of bonds to build bridges across the Catawba River was sustained, and in *Parvin v. Comrs.*, 177 N. C., 508, sustaining an act allowing Beaufort County to issue bonds for roads, and none of the acts considered in these cases were broader in scope, or more comprehensive as to subject-matter than the one before us.

2. That the act is in conflict with Art. VIII, sec. 4, of the Constitution, which is as follows: "It shall be the duty of the Legislature to provide by general laws for the organization of cities, towns, and incorporated villages, and to restrict their power of taxation, assessment, borrowing money, contracting debts, and loaning their credit, so as to prevent abuses in assessment and in contracting debts by such municipal corporations."

The position of the plaintiff is that the duty imposed on the General Assembly to pass general laws operates to prevent the enactment of all special laws relating to municipal corporations, and if this can be maintained the General Assembly has no power to incorporate a city or town, or to amend its charter or to authorize it to issue bonds or to confer any other power, whatever may be the needs of the particular locality, and the special acts of 1917 authorizing fifteen bond issues and granting or amending thirty-eight charters, and of 1919 having the same effect as to twenty-five bond issues and forty-one charters, are void.

Evidently the General Assembly has not put this construction on the amendments to the Constitution.

Judge Dillon, one of the ablest and most learned of American lawyers, discusses at some length express prohibitions in Constitutions against special legislation (Dillon Munic. Corp. (5 ed.), vol. 1, sec. 141), and concludes: "Thirty years experience with these general constitutional interdicts against local and special legislation have impressed the author with the conviction that they have failed to produce the beneficial results anticipated, and that this has been brought about because the prohibi-

tions of special legislation are too broad and sweeping. Special legislation in some form is often necessary, and it should be allowed, but carefully safeguarded. . . . Municipal administration is essentially local in its nature, and local features, peculiar to a single municipality, naturally call for special legislation. . . . The constitutional provisions were generally adopted about thirty years ago, and thirty years experience of legislation under their provisions gives grave reason to fear that, so far from being effective, they have not prevented legislation intended to have a special and local operation, and have caused endless uncertainty and confusion. . . . The application of constitutional provisions prohibiting special legislation has proved to be fraught with so many difficulties and to have resulted in so many inconsistencies that it may be doubted whether any lasting benefit has been derived from their adoption. . . . Special legislation to meet the wants, requirements, and special needs of each municipality, rather than general laws exclusively, is consonant with the fundamental principle and policy of local self-government and home rule, and in our judgment the true remedy is not absolutely and sweepingly to prohibit such legislation, but to safeguard it from legislative abuse. Such is the plain lesson taught by thirty years experience."

This section (Art. VIII, sec. 4), as said in *French v. Comrs.,* 74 N. C., 692, imposes on the Legislature "a moral obligation." It contains no prohibition on the exercise of legislative power, and has in it no declaration that private, local, or special acts shall not be passed relating to the organization of cities and towns, and conferring particular powers, and this omission, when considered in connection with the history of the recent amendments to the Constitution, is fatal to the claim that local or special acts may not be legally enacted, conferring special authority on municipal corporations.

The sessions of the General Assembly are practically limited to sixty days, and so much of its time was consumed in dealing with private and local bills that legislation of State-wide importance could not receive proper and deliberate consideration.

The General Assembly of 1915 undertook to remedy this evil by submitting several amendments to the Constitution, which were adopted at the election in 1916.

The first amendment requires the General Assembly to pass general laws on fourteen subjects, and declares "the General Assembly shall not pass any local, private, or special act or resolution" relating to them.

Among these subjects is "changing the names of cities, towns, and townships."

The second amendment authorizes the appointment of emergency judges, under certain conditions, and is not material.

The third strikes out the first section of Article VIII, and substitutes the section quoted above, and it will be noted that the old section provided for the organization of private corporations under general law, without prohibiting special legislation, while the new section prohibits a special act.

The fourth submits section 4 of Article VIII as it now stands, instead of section 4 as it was before it was amended, the only change being the insertion of the words "by general laws."

It is thus seen that the General Assembly had in mind and fully realized the evils of special, local, and private acts, and that it adopted a complete and comprehensive scheme by constitutional amendment as a remedy; that in doing so such legislation was expressly prohibited on fourteen subjects, including "changing the names of cities, towns, and townships"; that granting a charter to a private corporation or amending the same by special act was prohibited, but when it came to the municipal corporation the Legislature is left free and without express restraint, although since 1868 more than a thousand special acts have been enacted in reference to municipal corporations. Why should there be prohibitions on legislative action in amendments one and three and none in four, if the same restraint was to operate on all?

Why should it be said in amendment one, "The General Assembly shall not pass any local, private, or special act relating to 'changing the names of cities, towns, or townships,'" if section 4 prohibits special legislation relating to municipal corporations, which would include legislation changing the name?

When it is remembered that the amendments were submitted at the same time as parts of one scheme to get rid of special legislation as far as practicable; that special acts relating to municipal corporations were more numerous than any one other subject; that cities and towns are referred to in amendment one, but only in reference to changing the name; that there is positive restraint on legislative action as to all subjects except those embraced in section 4, and no restraint in that one, is it not clear that the true intent of the last section is to impose the duty of passing general laws relating to cities and towns, leaving it to the discretion of the Legislature to enact special acts as the needs of the municipalities may require?

The reason for making this distinction is that the needs of the different communities are so diverse that no Legislature could foresee the emergencies that would arise in different localities, or the necessity for additional powers dependent on changing conditions, and could not provide for them by general legislation, and the present case is an apt illustration of the wisdom of this course.

29—180

When the finance act was passed, declaring that municipal bonds should not be sold at less than par, there was a ready market for bonds, while now it is impossible to find a purchaser except at a discount, and already not only Wayne County towns, but also Tarboro, Plymouth, Roanoke Rapids School District, and Guilford County have applied for authority to sell for a less price as is shown by the acts of the special session, and the authority has been granted.

It may well be said of the failure to prohibit special legislation in Article VIII, section 4, as was said by *Rodman, J.,* in *French v. Comrs., supra,* of the refusal to limit the rate of taxation of cities and towns in the Constitution, "The omission was of purpose. It was unwise to establish in a law, which was expected to be comparatively permanent, the same maximum rate of taxation for all the cities and towns in the State, with population and other conditions so different."

However this may be, there is no prohibition in section 4, and "in the absence of an express constitutional provision to the contrary, the Legislature may enact special and local laws with respect to the establishment and government of municipal corporations. There is no constitutional objection to a law which is in fact applicable to but a single city or town." 19 R. C. L., 739.

The case of *Stuart v. Kirley,* 12 South Dakota, 245, is directly in point, as it was held in that case that the Legislature could enact a special act changing the boundaries of a particular county, although the State Constitution declared that "The Legislature shall provide by general law for changing county lines."

The case principally relied on by the plaintiff, 4 Kansas, 124, approved in 5 Kansas, 603, has language in it which sustains the position of the plaintiff, but it was not necessary to the decision of the case beause the Court had already held that the statute then under consideration was void under an express prohibition in the Constitution, and if the case is authority at all on this point, and should be followed, it would prohibit all acts of the Legislature in regard to municipal corporations, including the granting of charters, their amendment, extension of boundaries, etc.

The preamble to the finance act furnishes an argument that the Legislature of 1917 was of opinion that the amendment of 1916 is mandatory, to the extent that it imposes the duty to pass a general law, but not that it prohibits a special act, and in any event the Legislature of 1919 was of a different opinion, as it repealed the preamble (ch. 178, Laws 1919), and it is now no part of the finance act.

3. That the act confers special privileges, and is therefore in conflict with section 7, Article I, of the Constitution, which declares: "No man

or set of men are entitled to exclusive or separate emoluments or privileges from the community but in consideration of public services."

Answering a similar objection in *Reid v. R. R.,* 162 N. C., 359, the Court says: "Nor will the second objection avail plaintiff, that the act violates the section of the Constitution which prohibits the granting of special privileges and emoluments. The very section relied on by the appellant closes with the exception, 'but in consideration of public services,' and under our decisions these franchises granted to public-service corporations come directly within the words and meaning of the exception. *In re Spease Ferry,* 138 N. C., pp. 219-222."

In *Power Co. v. Power Co.,* 175 N. C., 677, it was objected that the right of eminent domain could not be conferred on one electric company, and the Court says: "Such a right has been conferred in many instances, especially in the case of railroad companies and other like corporations which serve the public. It is not forbidden to be done by our Constitution, Art. I, sec. 7 (Bill of Rights), which declares that 'no man or set of men are entitled to exclusive or separate emoluments or privileges from the community, but in consideration of public services,' because in this case the power to condemn is based upon the obligation to render that kind of service."

Surely if this principle avails the railroad and electric company, it will be applied in behalf of the municipal corporation, an agency of the State, created for the benefit of the public.

These are the constitutional objections, and no other can justify setting aside an act of the General Assembly, but there are others growing out of certain legislation, which may well be considered, although it should be sufficient to say that no Legislature can by general or special act bind its successor.

4. It is urged that the General Assembly, acting under the authority of Article VIII, section 4, of the Constitution, adopted the finance act, which requires bonds to be sold at par, and that the Wayne County act is in conflict with the general law, and should be set aside.

All acts of the Legislature are passed under constitutional authority, and if the position of the plaintiff can be maintained, it would withdraw from subsequent Legislatures the power of amendment or repeal.

The finance act is simply a legislative act, not a constitutional provision, and like other acts is subject to change at the will of the Legislature. *Bramham v. Durham,* 171 N. C., 197, is very much in point.

In 1915 (ch. 56) an act relating to local improvements, applicable to all municipalities, was adopted, acting under this section of the Constitution, and authorizing issues of bonds without a vote of the people. At the same session there was another act, confined in its operation to Durham, authorizing an issue of bonds for street improve-

ments, but requiring a vote of the people, and it was held that the two acts must be construed together, that the latter was in effect an exception from the first, and must be followed.

The Court, speaking through *Hoke, J.,* says: "It is a well recognized principle of statutory construction that when there are two acts of the Legislature applicable to the same subject, their provisions are to be reconciled if this can be done by fair and reasonable intendment, but, to the extent that they are necessarily repugnant, the latter shall prevail. The position is stated in substantially these terms by *Associate Justice Field* in *U. S. v. Tynen,* 78 U. S:, 92, as follows: 'Where there are two acts on the same subject, the rule is to give effect to both, if possible; but if the two are repugnant in any of their provisions, the latter act, and without any repealing clause, operates to the extent of the repugnancy as a repeal of the first'; and in Sedgwick on Statutory Construction, p. 127, quoting from *Ely v. Bliss,* 5 Beavan, it is said: 'If two inconsistent acts be passed at different times, the last is to be obeyed, and if obedience cannot be observed, without derogation from the first, it is the first that must give way.'

"Again, it is established that where a general and a special statute are passed on the same subject, and the two are necessarily inconsistent, it is the special statute that will prevail, this last being regarded usually as in the nature of an exception to the former. *Cecil v. High Point,* 165 N. C., pp. 431-435; *Comrs. v. Alderman,* 158 N. C., pp. 197-198; *Dahnke v. The People,* 168 Ill., 102; *Stockett v. Bird,* 18 Md., 484, a position that obtains though the special law precedes the general, unless the provisions of the general statute necessarily excludes such a construction. *Rodgers v. U. S.,* 185 U. S., 83; Black on Interpretation of Laws, p. 117."

This case was approved in *Power Co. v. Power Co.,* 171 N. C., 255, in an opinion by *Walker, J.,* who adds: "Where a later special law, local or restricted in its operation, is positively repugnant to the former law, and not merely affirmative, cumulative, or auxiliary, it repeals the older law by implication *pro tante,* to the extent of such repugnancy within the limits to which the latter applies. *McGavick v. State,* 30 N. J. L., 510; *Township of Harrison v. Supervisors,* 117 Mich., 215; *R. R. v. Ely,* 95 N. C., 77. 'The well settled rule of construction, where contradictory laws come in question, is that the law general must yield to the law special.' Moy's Maxims, 19. *S. v. Clark,* 25 N. J. L., 54."

There is no conflict between the two acts, and the latter should be read as an exception to the former.

5. It is further contended that the sale of the bonds at less than par is usurious and in conflict with the general law fixing the rate of interest in the State. If this was true it would furnish no reason for refusing

to give effect to the Wayne County act, because usury laws may be changed at will, but the transaction is not usurious, the sale of bonds being dealt with as a sale of chattels.

In 39 Cyc., 936, after stating that the delivery of a note by the maker to a purchaser at less than its face value is usurious, the author, Prof. Vance of the Yale Law School, says: "In some jurisdictions the principle just stated is applied to issues of municipal and other bonds purchased directly from the corporation at a discount greater than legal interest. But by the weight of authority such bonds are regarded as having a valid existence and transferable quality in the hands of the issuing corporation, and thus subject to sale at their market value, which may be at a discount much greater than legal interest, without making them subject to the taint of usury in the hands of an immediate purchaser."

In *Bank v. Mfg. Co.,* 96 N. C., 298, it was held that a sale of bonds of the face value of $45,000 for $30,000 was not usurious, and the same conclusion reached in *R. R. v. Ashland,* 79 U. S., 226, upon the ground that a sale of bonds was as the sale of any other chattel, where the bonds bore ten per cent interest on their face, and were sold to a corporation limited by its charter to taking more than seven per cent.

The following authorities also sustain this fully: *Orchard v. School District,* 14 Neb., 379; *Griffith v. Burden,* 35 Iowa, 143; *Gamble v. 2 C. W. Co.,* 123 N. Y., 93; *Memphis v. Bethel* (Tenn.), 17 S. W., 193; *Coe v. Railroad* (Ohio), 75 A. D., 518; *Memphis v. Brown,* 16 Fed. Cases, No. 9415.

The most interesting and instructive of these is the *Iowa case,* which says: "Under the more modern rule respecting municipal and corporation bonded indebtedness, whether the power to issue the bonds is derived from authority to 'borrow money,' to 'negotiate a loan,' to 'fund its indebtedness,' to 'contract a debt and issue its bonds therefor,' to 'issue and sell its bonds not exceeding,' etc., or, generally, to do any act or accomplish any work requiring, or which may properly be effectuated by the issuance of bonds, the power to sell the bonds in the market directly by the officers and agents of the municipality or corporation issuing them is well established. In other words, the authority to sell the bonds in the market is an incident attendant upon and growing out of the power to issue them. And it follows, hence, that the right and title of the first purchaser, directly from the municipality or corporation, is as perfectly and fully enforced and protected as if he were a third person buying the bonds in a subsequent market sale. The character of a chattel attaches to them under such circumstances, and the title passes as effectually as if they were chattels fairly sold at their market value, and no equities, such as might attach under like circumstances

to ordinary commercial paper, can be interposed as a defense, total or partial, in an action upon them. As was decided by a very able Court, in one of the many cases we have carefully examined: 'The obvious interest of the companies is that these bonds should be saleable, free from all questions of equity. They are generally issued for the express purpose of raising money by their sale. To declare them subject to the equities existing in the case of ordinary bonds, upon every transfer of them, would be to strike a blow at the credit of the great mass of these securities now in the market, the consequence of which it would be impossible to predict.' *The Morris Canal & Bank Co. v. Fisher,* 1 Stock., ch. 667 (*i. e.,* 700).

"This character of chattels, which by the modern rule it attached to these securities, must also, upon principle, exempt them from the defense of usury (as has been done by express statute in several of the States). For, if they are regarded as chattels, and this character is accorded to them in order to promote their sale and enhance their value as investments, then, since usury cannot be predicated upon a sale of chattels merely, neither can it be predicated upon a sale of bonds having the recognized character of chattels."

6. It is also urged that the act is not general in its application, and that it permits the municipal corporations of Wayne County to sell bonds at less than par when the same privilege is not granted in other localities.

In *Power Co. v. Power Co., supra,* this objection is met and the rule approved which is stated by *Judge Cooley,* as follows: " 'The authority which legislates for the State at large must determine whether particular rules shall extend to the whole State and all its citizens, or, on the other hand, to a subdivision of the State or a single class of its citizens only. The circumstances of a particular locality, or the prevailing public sentiment in that section of the State, may require or make acceptable different police regulations from those demanded in another, or call for different taxation and a different application of the public moneys. The Legislature may, therefore, prescribe or authorize different laws of police, allow the right of eminent domain to be exercised in different cases, and through different agencies, and prescribe peculiar restrictions upon taxation in each district or municipality, provided the State Constitution does not forbid. These discriminations are made constantly, and the fact that the laws are of local or special operation only is not supposed to render them obnoxious in principle.'

"And in the same work, at p. 554, note 2, it is said: 'To make a statute a public law of general obligation, it is not necessary that it should be equally applicable to all parts of the State. All that is required is that it shall apply equally to all persons within the territorial

limits described in the act,' citing *S. v. County Commissioners of Baltimore,* 29 Md., 516; *Pollock v. McClurken,* 42 Ill., 370; *Haskel v. Burlington,* 30 Iowa, 232; *Unity v. Burrage,* 103 U. S., 447."

In *S. v. Moore,* 104 N. C., 720; *S. v. Blake,* 157 N. C., 608, and in *Newell v. Green,* 169 N. C., 462, numerous instances are given of valid laws applicable to particular localities, the rule being as stated in the *Moore case,* and approved in the *Blake case:* "If the laws be otherwise unobjectionable, all that can be required in these cases is that they be general in their application to the class or locality to which they apply, and that they are public in their character, and of their propriety and policy the Legislature must judge."

We have in this State two well recognized exceptions to the usury statute, one allowing banks to take interest in advance (Rev., 228), which in the private individual would be usury, and the other, which is a part of the usury statute, permitting the bonds of private corporations to be sold at less than par, and it was held in *Bank v. Mfg. Co.,* 96 N. C., 298, that a sale of bonds of the par value of $45,000 for $30,000 by a private corporation was not usurious.

7. The last objection is that the *News and Observer* is not a financial paper within the meaning of the amendment to the finance act at the special session, requiring a certain notice to be published "in a financial paper or trade journal," but it is agreed that this paper, in addition to publishing general news, "also regularly publishes news relating to financial matters, and also publishes from time to time notices of proposed sales of municipal bonds of municipalities in North Carolina," which is a sufficient compliance with the statute.

The fact that the bonds were sold privately for a higher price than could be obtained at public sale, and after three efforts to sell after due advertisement, does not invalidate the sale.

The statute of 1920 has been passed to meet a pressing emergency, and is of limited duration, and as we find no constitutional objection to its enactment, it must be sustained.

Affirmed.

CLARK, C. J., dissenting: Up to the second Wednesday in January, 1917, the Constitution of North Carolina, Art. VIII, sec. 4, read as follows:

"SEC. 4. It shall be the duty of the Legislature to provide for the organization of cities, towns, incorporated villages, and to restrict their power of taxation, assessment, borrowing money, contracting debts, and loaning their credit, so as to prevent abuses in assessments and in contracting debts by such municipal corporations."

The General Assembly of 1915, ch. 99, submitted sundry amendments to the Constitution to the people for approval, and among them, section 4 of said act provided that the Constitution should be amended "by striking out section 4 of Article VIII and substituting therefor the following:

"It shall be the duty of the Legislature to provide *by general laws* for the organization of cities, towns, and incorporated villages, and to restrict their powers of taxation, assessment, borrowing money, and loaning their credit, so as to prevent abuses in assessment and in contracting debts by such municipal corporations."

Said act provided for the manner of voting upon the amendments, and the return of the votes and the declaration of the results, and section 8 of the said act provided that "any amendment so adopted shall take effect on the second Wednesday after the first Monday in January, 1917. Any provision of these amendments passed by the General Assembly, and so adopted by the qualified voters, inconsistent with, or in conflict with, any provisions of the present Constitution shall be held to prevail."

The amendment in question, striking out the former section 4, Article VIII, and substituting the new section 4 of that article, was declared duly adopted by the people at the ballot box, and has been a part of the Constitution since the prescribed date, 10 January, 1917.

It will be seen by comparison that the new section 4, Article VIII, differs from the old section of that article only by the insertion of the words *"by general laws"* in lines 1 and 2 thereof, so that, whereas, prior to the enactment of the substituted section, the Legislature was left free to discharge the duties placed upon it by said section, either by special laws or general acts, as it saw fit, by the substituted section the Legislature was empowered to exercise those duties *"by general laws"* only. Those who are conversant with the history of the State at that time, and with the discussion of this amendment in the press, in the General Assembly, and to the public before the election, will recall the purpose of such substitution was for the sole purpose of forbidding the Legislature to discharge the duties of that section by special legislation, and to restrict it to general laws on those subjects.

If this was not the intention in *substituting* the new section 4, Article VIII, for what purpose was it solemnly enacted by the General Assembly, and for what purpose did the people ratify it at the polls?

That the next succeeding General Assembly, whose members were elected on the same day this was ratified, so understood the object of this amendment is shown by the fact that the General Assembly of 1917 enacted chapter 136, which was a general act, very full and elaborate, "to provide for the organization and government of cities, towns, and incorporated villages," and also enacted chapter 140 (ratified 7 March, 1917), a general act entitled, "An act relating to general municipal

finance." The preamble to this act specifies that it is required by the constitutional amendment, and reads as follows:

"Whereas, the people of North Carolina, in November, 1916, adopted amendments to the State Constitution which prohibited the enactment of special legislation amending the charter of municipal and other corporations, and made it the duty of the Legislature to provide *by general laws* for the organization of cities, towns, and incorporated villages, and *to restrict their power* of taxation, assessment, borrowing money, contracting debts, and loaning their credit so as to prevent abuses in assessment and in *contracting debts* by such municipal corporation; and whereas, many of the municipalities of this State require the powers hereinafter mentioned; now, therefore"—

After this recital there follows a most careful and comprehensive act of 28 pages, covering every phase of the powers and duties conferred upon and "restricting municipal corporations as to taxation, assessment, borrowing money, contracting debts, and loaning their credits."

Section 5 of this act (ch. 140) provides: "All bonds of the municipality shall be sold by the governing body at not less than par." This section then goes on to prescribe in great detail the methods for advertising the bonds for sale, deposits by bidders, the award, right to reject bids, private sales, sales of bonds from sinking fund, which bonds only it is directed "may be sold at less than par."

The amendment strikes out the former section 4, Article VIII, which did not state the manner in which the Legislature should regulate the organization, government, and financial control of municipalities, but left it to that body to do these things, either by special acts or general laws, and substituted therefor the requirement that "it shall be the duty of the Legislature, by *general laws,*" to do these things. In 8 Cyc., 762 (c), it is said: "All constitutional provisions that *designate* in *express* terms the time or *manner of doing particular acts* and *are silent as to their performance in any other manner are mandatory,* and must bo followed."

The same doctrine is well set out, 6 R. C. L., sec. 50, 51 (pp. 55, 56): "It is the general rule to regard constitutional provisions as mandatory, and not to leave it to the will of the Legislature to obey or to disregard them. This presumption as to mandatory quality is usually followed unless it is unmistakably manifest that the provisions were intended to be directory only. . . . So strong is the inclination in favor of giving obligatory force to the terms of organic law that it has been said that neither by the courts nor by any other department of the Government can any provision of the Constitution be regarded as merely directory, but that each and every one of its provisions should be treated

as imperative and mandatory, without reference to the rules distinguishing between directory and mandatory statutes."

The Constitution is the "higher law," enacted by the people themselves as a mandate to the Legislature, and is a restriction upon their powers, which otherwise would be absolute. In view of the contention that this amendment is merely a suggestion to the Legislature, which it may observe or not, as financial interests may find it convenient, let us read against the provisions of this amendment so recently adopted at the ballot box:

"It *shall be the duty* of the Legislature to provide *by general laws* for the organization of cities, towns, and incorporated villages, and to restrict their power of *taxation,* assessment, *borrowing money, contracting debts,* and *loaning their credit* so as to prevent abuses in assessment, and in *contracting debts* by such municipal corporations."

There is nothing directory in this amendment. The purpose is clearly expressed to prevent abuses in contracting debt by the municipalities, and the means by which such abuses are to be prevented are "by general laws." It provides that "it shall be the duty of the Legislature" to do those things by *"general laws,"* which is a restriction to that method. The opportunity for abuse in such matters by special legislation procured by a single member of the Legislature, at the instance of local interests, was well known to all men, and the object was to prevent such legislation by the requirement in the Constitution that all legislation affecting such matters should be uniform and enacted by general laws as to which every member of the General Assembly would be fixed with responsibility, whereas, as is well known, special acts of local application receive no attention. To prevent this very evil, as well as to save the waste of time of the General Assembly in such legislation, the former section of the Constitution which permitted local legislation, as well as general laws, in providing for the regulation of municipalities, was stricken out and this amendment was adopted which made it the *duty* of the Legislature to enact such regulations of municipalities by *general laws.*

Referring to this very subject of special acts, *Bynum, J.,* one of the ablest and clearest-headed judges that has ever sat upon this bench, says in *Simonton v. Lanier,* 71 N. C., 505: "Public laws are founded on the gravest considerations of public benefit. They are deliberately enacted, are permanent in character, are for the benefit of all, and of universal application. Not so with private statutes, these are not of common concern, and do not receive the watchful and cautious scrutiny of the Legislature, which is devoted to those of a public character. They are often procured by agents and for a purpose, who are watchful to take advantage of any relaxation in legislative vigilance."

The mandatory character of the provisions of our Constitution, as to municipal indebtedness and to taxation is tersely stated by the Court in *McGuire v. Williams,* 123 N. C., at top of page 356, as follows: "Since the opinion in *Charlotte v. Shepard,* 122 N. C., 602, concurred in by every member of this Court, it must be considered *a settled rule* that the provisions of the Constitution in relation to *municipal indebtedness and taxation are mandatory,* and will be strictly enforced by this Court."

The provisions of this amendment, providing that legislation regulating municipal indebtedness and taxation shall be by general laws is too clear upon its face, and the purpose of its enactment is too well known, to leave any doubt that it was intended to prevent the abuses incident to special legislation, which could be controlled and influenced by local influences in favor of special interests.

One of the most familiar rules of construction of both statutes and constitutions is to give effect to the intent of the framers and of the people who adopted them, and it is especially applicable to all constitutions that they are to be construed so as to promote the objects for which they are framed and adopted. 8 Cyc., 730 (3a). The same proposition is stated in 6 R. C. L., sec. 45, p. 50, that a constitutional provision should not be construed so as to defeat its evident purpose, but rather so as to give it effective operation and suppress the mischief at which it was aimed.

If section 4, Article VIII, as it formerly stood, which permitted regulation of municipalities as to taxation and contracting debts by special act, as well as by general laws, was satisfactory and did not admit of abuses, for what purpose did the Legislature submit, and the people at the polls ratify, a constitutional provision, striking out the section as it stood, and reënacting it in exactly the same words in every respect except the insertion of the words, making it the duty of the Legislature to enact such legislation "by general laws"?

It is also said in 6 R. C. L., sec. 45, p. 51, that it is settled by the highest authority that in construing a Constitution or any clause thereof, "the Court should look to the history of the times and examine the state of things existing when the Constitution, or amendment thereto, was framed or adopted, to ascertain the old law, the mischief, and the remedy," and the text is supported by citations of authorities from U. S. Supreme Court, notably *R. I. v. Mass.,* 12 Pet., 657, and the famous *Slaughter House cases,* 16 Wall., 36. It is common knowledge that prior to the adoption of this amendment to the Constitution the Legislature was overwhelmed with a mass of special and private legislation affecting particular communities, and not the State as a whole, such legislation being often procured for the benefit of the special local interests of individuals.

The words of this amendment: "It shall be the duty of the Legislature to provide *by general laws*" absolutely commands the manner in which the laws affecting these municipalities and the subjects embraced in that section shall be passed, and the addition of the words of prohibition, directing the opposite not to be done, would be redundant and superogatory.

The defendant contends that a special act enacted by the General Assembly at the Special Session of 1920, entitled "An act relating to the finances of cities, towns, townships, and school districts of Wayne County," and authorizing them to sell their bonds "at such place and at such interest basis, whether above or below 6 per cent per annum, as the official board or body may determine to be the best obtainable," is valid as to the town of Goldsboro notwithstanding the above amendment which requires that all such legislation as to municipalities shall be enacted by general laws, and notwithstanding the two general statutes of 1917, enacted, as they recite, in consequence of such amendment and covering the entire scope of municipal regulation as to the matters cited in that amendment. If the Constitution is to govern, and the legislation of 1917 in accordance therewith, the special act of 1920 in regard to Goldsboro is invalid, because it is in conflict with the constitutional provision, and with the general laws enacted in accordance therewith.

It is asked, Could not the Legislature of 1920 amend or change the acts of the Legislature of 1917? Certainly. But in this matter of regulating municipalities such amendment or change must be made by general laws applying throughout the State, and not by special legislation applying only to the municipalities in a certain county.

There being two conflicting acts, one a "general law," as required by the Constitution, and the other "a special act," the court must hold the former and not the latter to be valid.

In *Atchison v. Barlow,* 4 Kan., 144, it appears in that State, as in this, formerly municipal corporations were organized and regulated by special statutes. The able opinion in that case sets out the abuses therefrom, and how local interests and influences profited financially and otherwise by legislation which could not have been enacted if proposed by general laws applying throughout the State. We need not repeat the details there given, for they are familiar here, and caused the adoption of the amendment to their Constitution almost identical with our amendment above. The Kansas amendment provided: "Art. 12, sec. 5. Provision shall be made by general law for the organization of cities, towns, and villages, and their power of taxation, assessment, borrowing money, contracting debts, loaning their credit shall be restricted so as to prevent the abuse of such power."

In that case the Supreme Court of that State held invalid all special legislation regulating municipalities in said respects, except by general

laws, and has adhered to such ruling ever since, greatly to the protection and satisfaction of the taxpayers in the municipalities of that State. Subsequently, an ingenious attempt was made to evade this constitutional amendment by amending the general statute, in such way that it could not apply but to three cities therein, and the Court, in *Topeka v. Gillett,* 32 Kan., 431, promptly held that invalid because in violation of the constitutional provision.

It has been strenuously urged that Goldsboro has made contracts for municipal improvements, and that just at present it cannot sell these bonds at par, and that if not allowed to sell them below par, the work must be stopped, and the banks in that city, which have advanced money on these bonds, will be seriously incommoded. But such considerations surely cannot prevail to set aside the will of the people of the State, as enacted in their Constitution. The provision had a wise purpose over and above the saving of time of the General Assembly wasted in special legislation. It is common knowledge that there are a few large bond-buying houses in the Union who purchase municipal bonds at the lowest available figure, and resell them at a large profit. Their local agents in this State can readily combine by agreeing upon a price among themselves below par (if sales below par are not prohibited by a general act, which cannot be evaded by special legislation), and bonds bought at a low figure in consequence of suppression in competition of the bond buyers, can later be parceled out among the buyers. The effective protection of the general act of 1917, which forbids the sale of municipal bonds below par, has been that such bonds, which have the advantage of being also tax-free, have hitherto sold readily at par. If that protection is nullified as to any one city, it may be removed as to any other whenever, with or without the coöperation of local influences, special legislation can be procured exempting such municipality from the control of the constitutional provision which prohibits local legislation in such matters by requiring general laws.

It is not suggested that in this instance there has been any combination of bond buyers or any ulterior motive on the part of any one. We have under consideration the possibilities of abuse that will be opened up. It will be readily seen that such occasions will occur if the constitutional provision requiring uniform legislation in regulation of the finances of municipalities and their power of contracting debts is not strictly adhered to. It is true that just at present there is a financial stringency, but it cannot be that the 6 per cent, tax-free bonds of a growing, prosperous, wealthy municipality like the city of Goldsboro can long be without sale at par, and should such condition occur, the Legislature could respond by a general act giving to all corporations the same power to sell their bonds below par.

It would be invidious to allow a few municipalities to sell their bonds below par while forbidding this privilege to all others. If the situation is such that Goldsboro cannot sell its bonds at par, while other towns are forbidden to sell at less than par, doubtless there is local patriotism and financial ability in Goldsboro that will tide over the situation until the city can obtain par for its bonds as is required of other municipalities. We know that Mecklenburg County has recently sold $300,000 of its bonds at 108; that Nash also has recently sold its bonds at 102; Randolph County and the thriving town of Hickory at par and interest, and "there are others."

Should there be a permanent depression in the market for 6 per cent, tax-free bonds of solvent municipalities, the remedy is for the Legislature to amend the general statute by extending the power to sell at less than par to all municipalities. But to permit this to be done as to few towns by special legislation tends to depress the market for all municipal bonds, and gives unlimited opportunity for a "rake-off" whenever influential combinations can manipulate the bonds of any particular towns. It was to prevent this that the control of the finances of the municipalities was placed with the Legislature, and that the Constitution requires that such legislation shall be by general laws and uniform.

Besides the reasons above given, special acts allowing certain municipalities to sell their 6 per cent, tax-free bonds below par are unconstitutional for another reason. We have a usury law, C. S., 2306, which imposes a penalty for exacting a greater interest than 6 per cent. The Bank of Statesville procured a private act amending its charter, ch. 64, Laws 1869-70, which authorized it "to discount notes and other evidences of debt, and to lend money upon such terms and rate of interest as may be agreed upon," and it was held in a strong opinion by *Bynum, J.,* in *Simonton v. Lanier,* 71 N. C., 503, that such act was unconstitutional and invalid, so far as it could be construed to authorize a rate of interest in excess of the general rate of 6 per cent, because it was in violation of the time-honored constitutional provisions: Art. I, sec. 7, of the Constitution, which declares that "No man or set of men are entitled to exclusive or separate emoluments, privileges, or immunities," and Art. I, sec. 31, "Perpetuities and monopolies are contrary to the genius of a free State, and ought not to be allowed." *Judge Bynum,* after quoting the above provisions of the Constitution, pertinently asked: "What public service has this bank rendered that it should be granted the exceptional privilege" that it should be exempted from the usury law? and said: "The wisdom and foresight of our ancestors are nowhere more clearly shown than in providing these fundamental safeguards against partial and class legislation—the insidious and everworking foes of free and equal government." This decision has never been overruled or

questioned, and its wisdom and justice has commended it to the approval of the public and the Court as is shown by the numerous citations thereto to be found in Anno. Ed., which we need not therefore take the space to recapitulate.

Not only is this special legislation authorizing the city of, Goldsboro to sell its bonds below par in violation of the above quoted sections of the Constitution, which require "Equal right to all and special privilege to none," and in violation of the amendment passed for the express purpose of requiring uniform legislation as to all municipalities, and in violation of the general acts passed, in pursuance thereof by the Legislature of 1917, but it is a serious discrimination against other towns and cities which are required to sell their bonds "at not less than par," and tends to depress the price of all municipal bonds in the State with great loss to the taxpayers, and giving unlimited opportunity for "rake-offs" to powerful combinations of capital which will be formed to depress the price of such bonds, and it is in violation of our usury law, and will inevitably force the repeal of that statute, which for so long a time has been a protection to our people; for who will lend money to a farmer, merchant, or any other legitimate business at 6 per cent if such towns as Goldsboro are allowed to sell 6 per cent, tax-free bonds at 4 to 6 per cent below par, which privilege will be extended to other cities by special act, and we may see the sale price of municipal bonds brought down to a far lower figure still. If the bonds are sold at 94, the present and future citizens of Goldsboro will pay for years to come $6 annually as interest for every $94 received (which is considerably more than 6 per cent on $100), besides the $6 initial "rake-off" to the buyers. Other towns will get similar acts in derogation to the Constitution. Local financial "rings" will be formed to elect boards to sell "bonds at less than par"—which phrase has "depths lower still," as is held in lively remembrance by those who can recall the time when even State bonds were hawked at 30 and less.

For these reasons I earnestly insist that this special act, giving this special privilege to Goldsboro to sell its bonds at less than par, is in violation of the constitutional provision enacted to prevent, among other things, this very legislation, and opens the doors wide to the very "abuses" which the amendment to require uniform legislation, "by general law," of municipalities was framed and adopted to prevent.

BROWN, J., dissenting: I can add nothing to the forcible dissent of the *Chief Justice* in this case.

With perfect deference for the opinion of the majority of my brethren, I feel that the decision of the Court is extremely unfortunate, and at one blow strikes down one of the most valuable amendments ever made to

our Constitution. The decision is destructive to the efforts of the General Assembly to maintain the credit of the cities and towns of the State by forbidding the sale of their securities below par. The general municipal act, enacted strictly in pursuance of the Constitution, presents a wise and elaborate scheme for the government of cities and towns. It is intended to be uniform, and to govern all alike. If the act had not been destroyed by this Court, it would have maintained the credit of municipalities, and have prevented gross abuses in disposing of their bonds.

It was this very policy that restored the credit of North Carolina after the Civil War. Art. V, sec. 4, of the Constitution provided that "until the bonds of the State shall be at par the General Assembly shall have no power to contract any new debt or pecuniary obligation in behalf of the State, except to supply a casual deficit," etc. It is well known that at that time the obligations of the State were hawked about and sold for what they would bring. What money the State borrowed, it had to pay a high rate of interest for. Instead of yielding to existing conditions, the people of the State resolutely forbade the sale of bonds at any price less than par. The consequence was that in a few years the State was able to dispose of its bonds without sacrifice. If our municipal act was upheld by this Court, and the plainly expressed will of the people obeyed, as it should be, the credit of our cities and towns would be undoubtedly maintained, and their securities not be placed at the mercy of a lot of bond sharks.

Municipal securities are greatly desired by the rich as they are free from Federal income tax and afford an absolutely safe investment. A 6 per cent bond of such a thriving city as Goldsboro, with such a splendid population, ought not to be allowed to be sold at less than par. It is a great blow to the credit of the city, and if this decision had been otherwise it would be only a short time before its bonds would sell at par. The record of the sales of sound municipal bonds in New York at this time shows that such securities sell on a 6 per cent basis, and in some instances less. It is better that Goldsboro should be temporarily inconvenienced than that the policy of the State in providing a uniform law for all cities and towns should be destroyed.

The fate of this wise and valuable amendment of 1916 to the Constitution reminds me of the epitaph on the tombstone of a small child:

"If I am so soon done for,
What was I begun for?"