CARRIE P. BAKER, ADMINISTRATRIX OF DAVID HENRY BAKER, DECEASED,
v. CITY OF LUMBERTON.

(Filed 29 January, 1954.)

**1. Municipal Corporations § 12—**

In the absence of statutory provision to the contrary, a municipality is not liable for the tortious acts of its officers or agents in discharging a duty imposed upon the municipality solely for the public benefit in the exercise of police power, or of judicial, discretionary or legislative authority.

**2. Same—**

In maintaining wires used in transmitting electricity solely for street lighting purposes, a municipality exercises a governmental function, and is not liable for any negligence of its officers and agents in the installation and maintenance of such wires.

**3. Electricity § 11: Negligence § 19d—Act of third person in moving fallen wire so that it became charged held to insulate defendant's negligence.**

Evidence tending to show that a wire maintained by defendant municipality broke and fell into the yard of a residence, that the broken wire was "dead," but that the owner of the residence threw it toward a pole so that it came in contact with and was energized by another wire, and that plaintiff's intestate then came in contact with the wire so charged, resulting in his death by electrocution, *is held* to disclose intervening negligence on the part of the owner of the residence insulating as a matter of law any negligence on the part of the municipality, since, as far as it appears

from the evidence, no injury would have resulted from the fallen wire had it not been moved so as to come in contact with the live wire.

### 4. Electricity § 10: Negligence § 19c—

Evidence tending to show that intestate, in the face of warnings, walked toward a fallen wire, which was emitting sparks, and stopped some five feet from the wire, looking at it, and that the wire suddenly moved and came in contact with his body, resulting in his death by electrocution, *is held* to show contributory negligence on the part of intestate, barring recovery as a matter of law.

### 5. Negligence § 11—

The law imposes upon a person *sui juris* the obligation to use ordinary care for his own protection, and the degree of such care should be commensurate with the danger to be avoided.

APPEAL by defendant from *Carr, J.,* at June Term, 1953, of ROBESON. Civil action to recover for alleged wrongful death.

Plaintiff alleges in her complaint, and on the trial offered evidence tending to show that on 23 June, 1952, while her intestate was visiting at the home of one Prentiss Gaddy on S. Chestnut Street in the city of Lumberton, N. C., at about five o'clock in the afternoon, his attention was called to a wire that had broken, and was hanging or dangling from a pole and lying on the ground in the front yard of said house; that Prentiss Gaddy picked up the wire, and threw it on the ground at a distance from the house and at a point in the outer edge of said yard; that thereupon plaintiff's intestate drew nearer to the wire, and the wire began to emit sparks and blue flame at the point of contact with the ground and began to writhe and swing about in a wide arc, and swung against him, causing his death by electrocution, before aid could reach him.

Plaintiff also alleges in her complaint that the death of her intestate was proximately caused by the negligence of defendant, in that defendant, in operating the system of electric wires and apparatus in the vicinity where plaintiff's intestate was killed, failed (a) to properly repair and inspect or to keep same in proper and safe condition; (b) to exercise due care to inspect the said line to determine whether the same was free from obstruction or contact with any tree or other object that might cause the same to break and fall to the ground; (c) to exercise care commensurate with the danger arising from its operation of wires for the transmission of high voltage of electricity that was without insulation, or from which the insulation had been rubbed off; (d) to respond to notice furnished it on numerous times prior to 23 June, 1952, that something was wrong with the wires in that particular locality and place so as to cause them to emit sparks and fire unnaturally, and permitted the condition to remain unattended to and unremedied; and (e) to exercise due care to keep its

said electric lighting system in reasonably safe condition and free from danger of exposed live wires.

Plaintiff further alleges in her complaint that she has duly filed claim with defendant, and it has failed to pay any part of it; and that this action was instituted within one year from date of death of her intestate.

Defendant, answering the complaint, admits the allegations in respect to (1) plaintiff filing claim with defendant, and its failure to pay same, and (2) the institution of this action within one year from the date on which the death of her intestate occurred, but denies, in material aspect, other allegations as above detailed.

And defendant, further answering, and as a further defense, avers:

"15. That the city of Lumberton furnishes electric current to its citizens and, in so doing, said defendant is engaged in a public or governmental function, and was, at the time of the matter herein complained of, acting as a governmental agency and not in a proprietary capacity, and by reason thereof, if the court should find that defendant's employees were negligent in any manner, as alleged in the complaint, which is denied, defendant would not be responsible for any such negligence.

"16. At the time of the matters herein complained of, there had occurred in the city of Lumberton, and in the surrounding country, a severe windstorm causing a dead electric wire to blow down in the yard of Prentice Gaddy. The said Prentice Gaddy picked up said dead wire without any injury to himself, and if plaintiff's intestate was thereafter killed by coming in contact with said wire, he did so with the full knowledge that said wire had been contacted with a live electric wire, and was emitting electricity. Though he had been warned to stay away from said wire as it was then charged with electricity, he carelessly, heedlessly and in disregard of his own safety, approached said dangerous wire, and his negligence in so doing was the sole proximate cause of the injury he received, thereby resulting in his death.

"17. If the court should find that defendant was negligent in any manner, as alleged in the complaint, which is denied, plaintiff's intestate, by his own negligence, contributed to his injury resulting in death.

"18. Defendant pleads the negligence and contributory negligence of plaintiff's intestate, as herein alleged, as a bar to any recovery herein."

Also by permission of the court, defendant first filed an amendment to its answer by inserting between paragraphs 15 and 16 of its answer a paragraph designated as 15½ as follows:

"15½. The electric wire which plaintiff's intestate came in contact with, causing his death, was a wire used by the city of Lumberton in transmitting electricity to its street lights only. The erection and maintenance of said wire which plaintiff's intestate came in contact with, thus causing his death, was a governmental function of the city of Lumberton

and, by reason thereof, if the court should find that defendant's employees were negligent in any manner with respect to said wire, as alleged in the complaint, which is denied, defendant would not be responsible for any such negligence."

(2) And further by permission of the court, defendant next filed an amendment to its answer by inserting between paragraphs 17 and 18 another paragraph designated 17½ as follows:

"17½. If the court should find that defendant was negligent, as alleged in the complaint, which is denied, the active negligence of a third party, to wit: Prentis Gaddy, in moving a dead electric wire so that it came in contact with a live wire, thus energizing with electricity and dead wire which came in contact with plaintiff's intestate, thereby causing his death, was the real efficient cause of the injuries resulting in the death of plaintiff's intestate, and the negligence of said third party intervened and insulated any prior negligence of defendant, if any, which is denied, and thereby became the sole proximate cause of the injuries resulting in the death of plaintiff's intestate."

Upon the trial in Superior Court plaintiff offered testimony of witnesses, briefly stated, as follows: A. B. Sansbury, City Manager of Lumberton, after testifying on direct examination as to profits made by the city of Lumberton in the business of distributing for gain electric energy to patrons in and outside of the city, continued on cross-examination: "The city of Lumberton not only furnishes electricity to its citizens and customers within and without the corporate limits, but furnishes electricity for the streets. The electricity that lights the homes of customers is on a different wire from the electricity that goes to light the streets; the current of electricity that goes into the homes doesn't go from any wire that lights the streets of the city of Lumberton." And on redirect examination witness concluded in these words: "I cannot give the exact date when I examined the S. Chestnut Street area. I did have knowledge of the conditions in June, 1952. That knowledge is from my own observation and also maps of the distribution of current of the city of Lumberton. The street lighting circuit is an entirely different circuit."

And Prentiss Gaddy gave this narrative: "I was living in the city of Lumberton on the 23rd of June, 1952 . . . down across the railroad on Chestnut Street . . . On that day David Henry Baker was killed at my house by a fallen wire, or met his death there . . . 5 or 5:30 in the afternoon. At the time . . . he was standing by the side of a tree in the yard. That evening it was misting rain and the wind was blowing. I was cutting grass. A wire broke in the yard and I moved it away. Me and him were looking at it. The wire started moving and went toward David Henry and he couldn't get out of the way. I don't know where the wire was before it broke. The wire fell right at the door step at the front. I

walked over and picked the wire up and moved it away from the house to the side of the light pole. I did not receive a shock at the time I picked up the wire . . . David Henry . . . cutting the grass . . . saw the wire down. Fire started popping from the wire and blowed into him. He was about four feet from the wire when it came in contact with him, and when it started moving around. I saw the wire when it hit David Henry. The wire hit his hand and when he fell it went across his chest. The wire hit the hand that was in a case . . . David Henry Baker did not grab the wire . . . touch the wire . . . pick the wire up or grab hold of it. The first contact with the wire was when it blowed toward him. He threw his hands out and the wire wrapped around his hands . . . the wind was pretty rapid and the trees were shaking. I was cutting grass with a sling blade. When the wire broke I stopped cutting grass. I stopped cutting because the wire broke. When I picked up the wire David Henry was cutting the grass . . . The place where David Henry came in contact with the wire is as far as from here to the gentleman sitting at the table from a light pole. It is a good piece from the other pole. It would be . . . not more than five feet. The other pole was . . . back toward town away from the house . . . There was a tree sitting in the edge of the yard,—a sycamore tree . . . The wires pass right through . . . the top of the tree. The limbs had grown around the wires in the top of the tree . . . There was more than one line . . .''

And this witness, under cross-examination, continued, "When I first picked up the wire, it was a dead wire. There was no current about it . . . It was after I had picked the wire up and put it down, that it began emitting electricity. When it began emitting electricity, Baker came toward the wire . . . Baker was a pretty good distance from the electric wire . . . When he started coming toward the wire . . . He didn't come right up to the wire . . . All the time he was being warned not to come near that wire . . . I didn't touch the wire after it was moving on the ground . . . When the wire was laying on the ground, the fire started coming . . . about five minutes after I left the wire."

Then Anna Wilkins gave the following as her version: ". . . My yard and Prentiss Gaddy's yard join . . . We live in adjoining houses on the same side of the street. That afternoon I was sewing on my front porch until it started thundering and lightning. I had an electric machine. I was just sitting there on the porch. I saw Prentiss and this young man, Baker, in the next yard . . . I saw the wire break. The wire was on the same side of Chestnut Street that I lived on. The wire broke right about in the tree top, at the corner of Prentiss' house. From time to time I had seen fire fly from that wire in the tree top. I had called the Power Company, it, or one of the men who work for the town. I had been seeing sparks coming from the wire for three and a half years . . . I called one

night about one o'clock . . . After that sparks still came from the wire. I called . . . four or five times . . . over a period of as much as three years . . . There was not a bad storm that day . . . I saw this wire fall and the next thing I observed was Prentiss walked and picked the wire up and threw it off. When he picked it up we hollered at him. He threw the wire and in just a minute it was on fire . . . in flames. At first the wire didn't do anything, but as it burned it began to move. When Gaddy threw the wire down, somebody called the Baker boy and told him: 'Look at that fire, it has caught fire and Prentiss had just thrown the wire down.' The Baker boy walked as near the wire as from me to you,— eight or ten feet. He said to me, 'That boy didn't have a bit of sense' . . . He was talking about Prentiss Gaddy who had picked the wire up first. I told him not to pick it up and he said he wasn't. He was standing still then. He then took a step or two which did get him a little nearer to the wire. He stopped five feet from the wire and was standing there looking at it. The wire all at once began to move; it went in a twisting shape and swayed toward the Baker boy. Baker threw his hands up . . . to protect his face it looked like, and the wire struck him . . . The light pole was almost half-way between Prentiss' house and our house and the tree was back at the other corner of Prentiss' house. I would say almost as far as from here to the back of the courtroom from the pole. I believe the next pole was a little further away than this one. I have never counted the wires that pass through that tree. I know there were several, five or six . . . At the place where I observed sparks emitting from the wire, wires passed near the limbs in the trees. The wires did go through the limbs in the tree, right through the tree."

And this witness, on cross-examination, continued, in pertinent part: ". . . I saw David Henry Baker come toward the wire and I warned him, but he kept coming. He stopped as much as eight feet from it; then he moved from the tree, walked toward another tree, not where the wire was through the top . . . I said he first walked down side of the wire between their yard and ours. He stopped and I told him then about the wire being dangerous and not to walk close to it, and he said 'I am not.' He did not leave going in the direction of the wire; went toward another tree which put him a little nearer the wire. I warned him then and he stopped as much as five feet from the wire then. I called the Light and Power Company, and they didn't come for some few minutes. I called again, I would say they came in twenty-five minutes at least . . ."

Plaintiff was allowed to offer in evidence: (1) That portion of paragraph 16 of defendant's answer, reading as follows: "At the time of the matters herein complained of, there had occurred in the city of Lumberton, and in the surrounding country, a severe windstorm, causing a dead electric wire to blow down in the yard of Prentice Gaddy. The said

Prentice Gaddy picked up said dead wire without any injury to himself, and if plaintiff's intestate was thereafter killed by coming in contact with said wire, he did so with full knowledge that said wire had been contacted with a live electric wire, and was emitting electricity." And (2) so much of paragraph 15½ of the amendment to the answer, reading as follows: "The electric wire which plaintiff's intestate came in contact with, causing his death, was a wire used by the city of Lumberton in transmitting electricity to its street lights only."

Defendant, reserving exception to denial of its motion for judgment as of nonsuit, entered when plaintiff first rested her case, offered testimony of witnesses tending to show (1) the performance of duty by the city in connection with the electric wire in question; and (2) that the wire which came in contact with plaintiff's intestate carried electricity only for lighting streets, and is on a different circuit from the circuit for lighting homes.

And the witness Willie McNeill, assistant superintendent of the Light and Water Department of the City, testified in pertinent part: "When I got down there my examination revealed that the wire that carried current for street was being energized. It was crossed up with a 2300 volt wire, going into a private home. This had caused the energizing of this street lighting wire. That wire that lights the street at that point was a dead wire, that is before it came in contact with a live wire. It stays off all day at the plant and is energized at night, that is the street lighting wire. That 2300 volt wire is one of our lead wires that we use for commercial purposes going into the house . . ."

Plaintiff offered, in rebuttal, testimony of the City Manager, recalled to the stand, in respect to the system of distributing electricity to patrons, and for street lighting.

Motion of defendant for judgment as of nonsuit renewed at the close of all the evidence was denied. Defendant excepted.

The case was submitted to the jury on three issues,—as to negligence of defendant, contributory negligence of plaintiff, and damages. The jury answered all favorably to plaintiff. Whereupon judgment for plaintiff was signed by the court.

Defendant appeals therefrom to Supreme Court and assigns error.

*R. L. Campbell and F. D. Hackett for plaintiff, appellee.*
*McLean & Stacy for defendant, appellant.*

WINBORNE, J. The only assignment of error is based upon exception to denial of defendant's motions, aptly made, for judgment as of nonsuit.

1. It is contended, and rightly so, that the evidence shows affirmatively that the death of plaintiff's intestate resulted from contact with a wire

used by the city in transmitting electricity for street lighting purposes only, a governmental function, in the performance of which the city is not liable for tortious acts of its officers and agents. *Hodges v. Charlotte,* 214 N.C. 737, 200 S.E. 889; *Beach v. Tarboro,* 225 N.C. 26, 33 S.E. 2d 64; *Alford v. Washington,* 238 N.C. 694; *Hamilton v. Hamlet,* 238 N.C. 741.

The decisions of this Court uniformly hold that, in the absence of some statute which subjects them to liability therefor, when cities acting in the exercise of police power, or judicial, discretionary, or legislative authority, conferred by their charters or by statute, and when discharging a duty imposed solely for the public benefit, they are not liable for the tortious acts of their officers or agents. See *Hodges v. City of Charlotte, supra;* also *Hamilton v. Hamlet, supra,* and numerous cases there cited.

And it has been held by this Court that the installing and maintaining of traffic light system in and by a city is in the exercise of a discretionary governmental function. See *Hodges v. City of Charlotte, supra; Beach v. Tarboro, supra; Alford v. Washington, supra; Hamilton v. Hamlet, supra.*

II. If it be conceded that the city of Lumberton were negligent in any respect alleged in the complaint, it affirmatively appears from the evidence offered by plaintiff that the injury to and death of the intestate of plaintiff was "independently and proximately produced by the wrongful act, neglect, or default of an outside agency or responsible third person." See *Smith v. Sink,* 211 N.C. 725, 192 S.E. 108; also *Alford v. Washington, supra,* and cases there cited.

The fallen wire was dead until it was picked up by Prentiss Gaddy and moved away from the house to the side of the light pole. So far as it appears from the evidence, there would have been no injury to anyone but for this intervening act which insulated any negligence on the part of defendant. See *Mintz v. Murphy,* 235 N.C. 304, 69 S.E. 2d 849; *Alford v. Washington, supra.*

III. Also, if it be conceded that the city of Lumberton were negligent in any of the respects alleged in the complaint, it affirmatively appears from the evidence offered by plaintiff that the intestate of plaintiff was negligent in approaching the wire—when he saw, and was warned, that it had become alive with electricity,—thereby he contributed proximately to his injury and death. The law imposes upon a person *sui juris* the obligation to use ordinary care for his own protection, and the degree of such care should be commensurate with the danger to be avoided. *Rice v. Lumberton,* 235 N.C. 227, 69 S.E. 2d 543; *Mintz v. Murphy, supra.*

Hence this Court is constrained to hold that on any, and all of the grounds so stated, plaintiff has failed to make out a case of liability against defendant city of Lumberton. Therefore the judgment below is
        Reversed.