COKE CANDLER, HARRY P. MITCHELL AND JOHN C. VANCE, MEMBERS OF THE BOARD OF COUNTY COMMISSIONERS OF BUNCOMBE COUNTY AND EX OFFICIO TRUSTEES OF SOUTH BUNCOMBE WATER AND WATERSHED DISTRICT, OF SWANNANOA SANITARY SEWER DISTRICT, OF BEAVERDAM WATER AND SEWER DISTRICT, OF CANEY VALLEY SANITARY SEWER DISTRICT, OF HAZEL WARD WATER AND WATERSHED DISTRICT, OF VENABLE SANITARY DISTRICT, IN BEHALF OF ALL WATER CONSUMERS OF BUNCOMBE COUNTY WHOSE PROPERTY IS CONNECTED TO ANY OF THE WATER MAINS OF ANY OF SAID DISTRICTS; P. MORTON KEARY, TOM COLE, FRANK LOWE, MRS. NELL BUSCH, HOYT SPIVEY AND W. E. CREASMAN, WATER CONSUMERS IN THE ABOVE-NAMED DISTRICTS WHOSE PROPERTIES ARE CONNECTED TO WATER MAINS OF SAID DISTRICTS, IN THEIR OWN BEHALF AND IN BEHALF OF ALL RESIDENTS OF BUNCOMBE COUNTY WHOSE PROPERTIES ARE CONNECTED TO ANY OF THE WATER MAINS OF THE AFOREMENTIONED DISTRICTS v. CITY OF ASHEVILLE, A MUNICIPAL CORPORATION.

(Filed 10 January, 1958)

1. **Municipal Corporations § 1—**

A municipal corporation has a dual capacity: one, governmental or political, the other proprietary or *quasi*-private.

2. **Municipal Corporations § 6—**

While public utilities, such as water and lights, are necessary municipal expenses, nevertheless a municipality in furnishing water and lights to private consumers acts in a proprietary capacity.

3. **Municipal Corporations § 5—**

A municipal corporation is under the absolute control of the Legislature in regard to purely governmental matters, but as to proprietary municipal functions the Legislature is under the same constitutional restraints that are placed upon it in regard to private corporations.

4. **Constitutional Law § 11: Utilities Commission § 2—**

The State, in the exercise of a governmental function pursuant to the police power, has authority to regulate and establish rates to be charged by instrastate utilities, which power it may exercise directly or by delegation to administrative agencies under prescribed rules and standards. The General Assembly has not given the Utilities Commission authority to establish rates for municipally owned utilities.

5. **Municipal Corporations § 8b—**

The General Assembly has prescribed adequate standards for the fixing of rates by municipalities owning their own water works system and has authorized such municipalities to furnish water to private consumers outside their corporate limits and to charge for such services a different rate from that charged consumers within their limits. G.S. 160-255, G.S. 160-256.

6. **Municipal Corporations § 5: Statutes § 2—**

There is no contract between the State and the public that a municipal charter shall not at all times be subject to amendment by the Gen-

eral Assembly, and Section 4, Article VIII, of the State Constitution does not forbid the Legislature from doing so by special act.

**7. Municipal Corporations § 8b—**

Since a municipality has no legal right either in its governmental or proprietary capacity to sell water to consumers residing outside its corporate limits without legislative authority, the Legislature has the power to fix the terms upon which such sales shall be made; provided, such terms permit the establishment of a rate or rates which will be fair and just to the consumer and will produce a proper return to the municipality.

**8. Same: Statute prescribing that residents of sanitary districts should not be charged for water at higher rate by municipality held constitutional.**

Residents within sanitary districts adjacent to a municipality constructed and maintained with funds derived from a tax levied therein their respective water and sewer systems. The municipality sold water to such districts at bulk sale rates by metering same through master meters. Later, the municipality sold water directly to the individual consumers in the districts and billed such consumers at a higher rate than that charged residents of the city. *Held:* A statute thereafter enacted (Chapter 399, Public-Local Laws of 1933) prohibiting the municipality from charging residents in such districts at a higher rate, but not prescribing the rates to be charged by the municipality or commanding it to furnish water to consumers outside its limits, renders void an ordinance subsequently enacted in conflict therewith, since the statute is valid and does not violate Section 17, Article I, of the State Constitution or the Fourteenth Amendment to the Federal Constitution, the rates fixed by the city for its residents being presumed just and reasonable and the city having no expense in regard to the construction, maintenance or repair of the systems within the respective districts.

**9. Municipal Corporations § 8b—**

In prohibiting a municipality from charging residents in sanitary districts outside the municipality rates for water service in excess of rates charged residents of the municipality, the General Assembly may prescribe that it should be unlawful for the city to charge non-residents within the sanitary districts a higher rate, notwithstanding that ordinarily the violation of a rate regulation merely subjects the violator to a penalty.

**10. Estoppel § 10—**

A municipality cannot be estopped from enforcing a valid ordinance or from contesting the validity of an act it deems unconstitutional.

APPEAL by plaintiffs from *Campbell, J.,* May Term 1957 of BUNCOMBE.

This is an action to restrain the City of Asheville from putting into effect an ordinance which provides a higher rate for consumers of water living outside the City than that charged to consumers residing in the City.

The facts essential to an understanding of the questions involved on this appeal are stated below.

1. Between 1923 and 1927, pursuant to various Acts of the Legislature, there were formed in Buncombe County six water and sewer districts. These districts were duly incorporated by the Legislature as municipal corporations for the purpose of furnishing to the residents of the respective districts water and sewer service. By the provisions of the various Acts of the Legislature, the districts were given geographical boundaries and were authorized to acquire rights of way for water and sewer lines, to construct such lines, and to hold elections authorizing the issuance of bonds in payment therefor.

2. The six districts issued bonds as follows: South Buncombe Water and Watershed District—$400,000.00 5½% Water and Sewer Bonds, dated 1 May 1927. Swannanoa Sanitary Water District—$1,723,000.00 5½% Water and Sewer Bonds, dated 1 July 1927, and $150,000.00 6% Water and Sewer Bonds, dated 15 May 1929. Beaverdam Water and Sewer District—$500,000.00 5% Water and Sewer Bonds, dated 1 September 1927. Caney Valley Sanitary Sewer District—$66,000.00 6% Water and Sewer Bonds, dated 1 May 1927. Hazel Ward Water and Watershed District—$48,000.00 6% Water and Watershed Bonds, dated 1 November 1926. Venable Sanitary District—$45,000.00 6% Water Bonds, dated 1 January 1928.

3. Each respective district was created and organized and the Board of Commissioners of Buncombe County made trustees thereof, pursuant to the following Acts of the General Assembly: (a) South Buncombe Water and Watershed District—Chapter 501 of the 1925 Public-Local Laws of North Carolina, and Chapter 246 of the 1927 Public-Local Laws of North Carolina. (b) Swannanoa Sanitary Water District—Chapter 249 of the 1927 Public-Local Laws of North Carolina, and Chapter 139 of the 1931 Public-Local Laws of North Carolina. (c) Beaverdam Water and Sewer District—Chapter 135 of the 1927 Private Laws of North Carolina. (d) Caney Valley Sanitary Sewer District—Chapter 341 of the 1923 Public-Local Laws of North Carolina, and Chapter 243 of the 1927 Public-Local Laws of North Carolina. (e) Hazel Ward Water and Watershed District—Chapter 501 of the 1925 Public-Local Laws of North Carolina, and Chapter 235 of the 1927 Public-Local Laws of North Carolina. (f) Venable Sanitary District—Chapter 237 of the 1927 Public-Local Laws of North Carolina.

Each plaintiff listed below is a citizen of Buncombe County and resides in the district hereinafter indicated and is a consumer of water, whose property is connected to one of the water

mains of the district in which he resides, to wit: P. Morton Keary, South Buncombe Water and Watershed District; Tom Cole, Swannanoa Sanitary Water District; Frank Lowe, Beaverdam Water and Sewer District; Mrs. Nell Busch, Caney Valley Sanitary Sewer District; Hoyt Spivey, Hazel Ward Water and Watershed District; and W. E. Creasman, Venable Sanitary District.

4. The Board of Commissioners of Buncombe County as ex officio trustees of such municipal corporations or districts enumerated herein, are charged with the management, operation and control of each of such corporations, and have the power, as such trustees, to do all things necessary for the successful operation of water and sewer systems, including purchasing of land, rights of way, laying of pipes, and such other things as may be necessary for the successful operation of sewer and water systems in said districts, including the maintenance thereof. The Board of Commissioners, as such, and not as trustees, is authorized and directed by the Special Acts to levy annually a special tax in the respective districts for the maintenance of the water and sewer systems located therein, and to levy annually in each district a tax sufficient to pay the principal and interest due on the bonds issued by such district.

5. That for the year 1954-1955, the following were the debt service levies for said districts: South Buncombe Water and Watershed District—$8,189.00—15.40¢ per $100 valuation. Swannanoa Sanitary Water District—$45,280.00—20.70¢ per $100 valuation. Beaverdam Water and Sewer District—$2,268.00 —13.10¢ per $100 valuation. Caney Valley Sanitary Sewer District—$1,850.00—29.00¢ per $100 valuation. Hazel Ward Water and Watershed District—$2,300.00—12.30¢ per $100 valuation. Venable Sanitary District—$1,300.00—16.00¢ per $100 valuation. That for prior years said County Commissioners have levied varying amounts for said debt service but generally comparable to the figures above stated.

6. That for the year 1954-1955, the levy for maintenance and upkeep of said lines and systems for each of the districts was as follows: South Buncombe Water and Watershed District —$12,500.00—18.60¢ per $100 valuation. Swannanoa Sanitary Water District—$44,500.00—19.50¢ per $100 valuation. Beaverdam Water and Sewer District—$3,800.00—19.90¢ per $100 valuation. Caney Valley Sanitary Sewer District—$1,400.00— 16.00¢ per $100 valuation. Hazel Ward Water and Watershed District—$2,100.00—9.70¢ per $100 valuation. Venable Sanitary District—$2,200.00—15¢ per $100 valuation.

7. Pursuant to the provisions of Chapter 205 of the 1929 Private Laws of North Carolina, the corporate limits of the City of Asheville were enlarged and extended so as to include within the extended corporate limits of the City portions of the territory embraced within the boundaries of the Beaverdam Water and Sewer District, the South Buncombe Water and Watershed District, and the Swannanoa Sanitary Water District. The City of Asheville, as required by Section 8 of the above Act, assumed the payment of a portion of the bonded indebtedness of said districts in proportion to the percentage the assessed valuation of the territory annexed to the City of Asheville bore to the assessed valuation of the entire territory of said districts. As of 1 July 1936, the date of the refunding of the bonded indebtedness of said districts, the City of Asheville had assumed the following percentages and amounts of the bonded indebtedness incurred by said districts: The percentage of the indebtedness in the Beaverdam Water Sewer District was 86.043, and the amount was $430,215.00; the percentage in the South Buncombe Water and Watershed District was 39.6765, and the amount was $158,706.00; the percentage in the Swannanoa Sanitary Water District was 27.7688, and the amount was $538,839.00. As of 1 July 1949, the City of Asheville assumed the proportionate percentage and amount of the outstanding indebtedness of the Caney Valley Sanitary Sewer District, which had been included within the territorial limits of the City of Asheville, as follows: 25.68253, and the amount of $12,841.27. As of 1 July 1955, the outstanding indebtedness of the four districts referred to in this paragraph was $1,742,000.00, of which the City of Asheville had assumed $713,304.89.

8. That since the assumption by the City of Asheville of the indebtedness hereinabove set out, the City of Asheville has levied anually an ad valorem tax on all the taxable property in the City of Asheville of a sufficient rate to pay the principal and interest of that part of said indebtedness of said districts so assumed, as required by Section 8 of Chapter 205 of the 1929 Private Laws of North Carolina.

9. It is stipulated by the parties to this action that, for the fiscal year ending 30 June 1956, 5,983 water meters were in operation in the said water districts outside the City of Asheville; that the individual consumers residing in the districts purchased and installed these meters at an average initial cost of $40.00 per meter; that the City of Asheville served on the above date, in and outside its corporate limits, a total of 20,977 water meters; that the revenue during the year indicated from the meters located outside the City was $285,483.00, and all

revenue from the sale of water through all the above meters was $1,056,703.00, and the total cost of billing and meter reading was $85,365.00.

10. It is also stipulated that the City of Asheville has, over a long period of years, beginning over fifty years ago, invested in a waterworks system a sum in excess of ten million dollars, which system consists of watersheds comprising approximately thirty square miles in area, located on the North Fork of the Swannanoa River and on Bee Tree Creek in Buncombe County, at a distance of approximately fifteen miles from the City of Asheville, impounding dams, chlorinating plants, pumping installations, transmission lines from said watersheds to the City of Asheville, reservoirs and a network of distribution lines operated and maintained by large maintenance crews and personnel employed by the City of Asheville, which waterworks system was originally for the primary purpose of providing the citizens of Asheville with an adequate supply of wholesome water for domestic and industrial purposes and for fire protection. It is further stipulated that, including the water bonds issued by the City of Asheville on 1 December 1951, in the sum of $2,750,000.00, the combined unpaid indebtedness of the City for the waterworks system as of 30 June 1955 was $6,404,593.44.

11. Prior to the year 1928, the City of Asheville sold water in bulk under its ordinances to certain of said water districts, by means of metering the same through one or more master meters located in one or more districts, and such districts paid the City therefor at rates provided for bulk sales of water, and the districts sold the water at retail prices to the individual consumers and did its own billing and collecting. In 1928, this method was abandoned and the City of Asheville thereafter sold water directly to the individual consumers in the districts and billed the individual consumers on the basis of rates then in effect under its ordinances.

12. On 29 February 1928, the City of Asheville adopted an ordinance which reduced the rates to customers outside its corporate limits but still charged a rate to outside customers double that charged customers inside its corporate limits. Effective as of 25 August 1930, the City of Asheville increased its water rates to both its inside and outside customers, still leaving the cost to outside customers double that charged to customers living within its corporate limits.

13. That the General Assembly of North Carolina, at its 1933 session, enacted Chapter 399 of the 1933 Public-Local Laws, reading as follows: "Section 1. That from and after the passage of this Act, it shall be unlawful for the City of Asheville, or any

of the governing authorities, agents, or employees thereof, to charge, exact, or collect from any resident of Buncombe County, whose property is now connected or may hereafter be connected with the main of any water district which has paid or issued bonds for the payment of the expense of laying such main, a rate for water consumed higher than that charged by the City of Asheville to persons residing within the corporate limits of said City.

"Section 2. That the City of Asheville is hereby specifically authorized and empowered, through its officers, agents and employees, to cause any user of water who shall fail to pay promptly his water rent for any month to be cut off, and his right to further use of water from the city system to be discontinued until payment of any water rent in arrearages.

"Section 3. That it is the purpose and intent of this Act to declare that persons residing outside the corporate limits of the City of Asheville shall be entitled to the use of Asheville surplus water only, and the governing body of the City of Asheville is authorized and empowered to discontinue the supply of water to any districts, or persons, out of the corporate limits of the City of Asheville at any time that there may be a drought or other emergency, or at any time the governing body of the City of Asheville may deem that the city has use for all of its water supply.

"Section 4. That it shall be the duty of the County Commissioners of Buncombe County and/or trustees of the different water districts operating outside of the corporate limits of the City of Asheville, in Buncombe County, to maintain the water lines in proper repair, in order that there may not be a waste of water by leakage."

14. That after the passage of the above Act, the City of Asheville billed consumers of water in the various districts at the same rate as that charged consumers of water living inside the City of Asheville, until 1 September 1955. That on 11 August 1955, the City Council of the City of Asheville enacted Ordinance No. 383, to be effective as of 1 September 1955, establishing rates for outside consumers substantially higher than those charged its consumers within its City limits.

Upon the foregoing finding of facts by the court below, it was concluded as a matter of law that (a) Chapter 399 of the 1933 Public-Local Laws of North Carolina is unconstitutional and void and is contrary to the Constitution of the State of North Carolina and the Constitution of the United States of America, and particularly is in violation of Section 17 of Article I of the Constitution of North Carolina and the Fourteenth

Amendment to the Constitution of the United States of America, and other applicable provisions of said Constitutions; (b) that the defendant, City of Asheville, is not estopped to assert the invalidity of Chapter 399 of the 1933 Public-Local Laws of North Carolina; and (c) that Ordinance No. 383 enacted by the City Council of the City of Asheville, on 11 August 1955, and every section thereof, is in all respects lawful and valid.

Judgment was entered accordingly, the temporary restraining order theretofore entered was dissolved, the action was dismissed and the plaintiffs directed to pay the costs of the action to be taxed by the Clerk.

Plaintiffs appeal, assigning error.

*Ward & Bennett, Roy A. Taylor, William M. Styles, for plaintiff appellants.*

*Robert W. Wells, Charles N. Malone, Frank M. Parker, for defendant appellee.*

DENNY, J.  The numerous exceptions and assignments of error preserved and brought forward on this appeal, in our opinion, present only three questions which require our consideration and determination.  (1) Did the trial court err in holding that Chapter 399 of the 1933 Public-Local Laws of North Carolina is unconstitutional and contrary to Section 17, Article I, of the Constitution of North Carolina, and the Fourteenth Amendment to the Constitution of the United States?  (2) Did the trial court err in holding that the defendant City of Asheville is not estopped to assert the invalidity or unconstitutionality of the above Act?  (3) Did the trial court err in holding that Ordinance No. 383, enacted by the City Council of the City of Asheville, on 11 August 1955, is lawful and valid and in full force and effect?

The correctness of the ruling of the court below on the first question posed, turns on whether or not the General Assembly has the power to prohibit a municipality from selling water to consumers residing outside its corporate limits at a higher rate than the rate fixed for consumers of water who reside within its corporate limits, where such outside consumers reside in a water or water and sewer district in which the taxpayers of the district have constructed the water or water and sewer facilities and are maintaining them out of ad valorem taxes levied on the real and personal property in the district.

A municipal corporation in this State has a dual capacity. One is governmental or political, and the other is proprietary or *quasi*-private. *Asbury v. Albemarle,* 162 N.C. 247, 78 S.E. 146;

*Holmes v. Fayetteville,* 197 N.C. 740, 150 S.E. 624; *Millar v. Wilson,* 222 N.C. 340, 23 S.E. 2d 42; *Nash v. Tarboro,* 227 N.C. 283, 42 S.E. 2d 209; *Rhodes v. Asheville,* 230 N.C. 134, 52 S.E. 2d 371.

A municipality acting in its governmental capacity is an agency of the State for the better government of those residing within its corporate limits, and while public utilities, like water and lights, are now held to be a necessary municipal expense, *Fawcett v. Mt. Airy,* 134 N.C. 125, 45 S.E. 1029, even so, they are not provided by a municipality in its political or governmental capacity, except insofar as they may furnish water for extinguishing fires and for other municipal purposes, *Harrington v. Greenville,* 159 N.C. 632, 75 S.E. 849; *Howland v. Asheville,* 174 N.C. 749, 94 S.E. 524; *Klassette v. Drug Co.,* 227 N.C. 353, 42 S.E. 2d 411; and provide electric energy for lighting streets, *Baker v. Lumberton,* 239 N.C. 401, 79 S.E. 2d 886; or for the operation of traffic light signals, *Hamilton v. Hamlet,* 238 N.C. 741, 78 S.E. 2d 770, or other municipal purposes, but, in its proprietary capacity it acts exclusively in a private or *quasi*-private capacity for its own benefit.

"In matters purely governmental in character it is conceded that the municipality is under the absolute control of the legislative power, but as to its private or proprietary functions, the Legislature is under the same constitutional restraints that are placed upon it in respect of private corporations." *Asbury v. Albemarle, supra.* No one challenges the power of the State to fix rates for private utilities or for utilities operated in a proprietary capacity by a municipality.

In this State, the power to regulate and to establish the rates to be charged by intrastate railroads, motor vehicle carriers of passengers and freight, power companies, etc., has been delegated to the North Carolina Utilties Commission. However, the right to establish rates for municipally owned electric light plants, water, or water and sewer systems, has never been given to the Utilities Commission.

In *Utilities Commission v. State,* 239 N.C. 333, 80 S.E. 2d 133, this Court, speaking through *Barnhill, J.,* later *C.J.,* said: "This right to grant franchises to public service corporations and to fix or approve the rates to be charged by them for the services rendered the public rests in the Legislature. The General Assembly may act directly or it may delegate its authority to an administrative agency or commission of its own creation. However, no Act undertaking to delegate the rate-making function of the Legislature is valid unless the General Assembly prescribes rules and standards to guide the legislative agency in

exercising the delegated authority. *Motsinger v. Perryman,* 218 N.C. 15, 9 S.E. 2d 511; *S. v. Harris,* 216 N.C. 746, 6 S.E. 2d 854; *Hospital v. Joint Committee,* 234 N.C. 673 (concurring opinion at p. 684), 68 S.E. 2d 862; *Coastal Highway v. Turnpike Authority,* 237 N.C. 52, 74 S.E. 2d 310."

In 43 Am. Jur., Public Utilities and Services, section 83, page 624, *et seq.,* it is said: "In accordance with its right to regulate and control public utilities, a state may, under its police power and within constitutional limitations, regulate and prescribe reasonable rates at which charges may be made by public utilities for their services to the public. The function of rate making is purely legislative in character, whether it is exercised directly by the legislature itself by the enacting of a law fixing rates or by the granting of a charter wherein the rates are regulated, or is exercised by some subordinate administrative or municipal body to whom the power of fixing rates has been delegated; in any of such cases, the completed act derives its authority from the legislature and must be regarded as an exercise of the legislative power."

In the last cited authority, section 94, page 636, we find this statement: "The well recognized general rule is that when a governmental body has the power to regulate the rates for charges for services by public utilities to consumers, that power includes the power to fix any maximum rate which is fair and just to the consumer if it will also produce a proper return to the public utility."

It is clear that the power to establish rates is a governmental function and not a proprietary one. It is likewise clearly established in this jurisdiction that municipalities "are creatures of the legislature, public in their nature, subject to its control, and have only such powers as it may confer. These powers may be changed, modified, diminished, or enlarged, and, subject to the constitutional limitations, conferred at the legislative will. There is no contract between the State and the public that a municipal charter shall not at all times be subject to the direction and control of the body by which it is granted." *Holmes v. Fayetteville, supra.*

In the case of *St. Joseph Stock Yards Co. v. United States,* 298 U.S. 38, 80 L.Ed. 1033, in speaking for the Court, *Chief Justice Hughes* said: "The fixing of rates is a legislative act. In determining the scope of judicial review of that act, there is a distinction between action within the sphere of legislative authority and action which transcends the limits of legislative power. Exercising its rate-making authority, the legislature has a broad discretion. It may exercise that authority directly, or

through the agency it creates or appoints to act for that purpose in accordance with appropriate standards. The Court does not sit as a board of revision to substitute its judgment for that of the legislature or its agents as to matters within the province of either. * * * When the legislature itself acts within the broad field of legislative discretion, its determinations are conclusive. When the legislature appoints an agent to act within the sphere of legislative authority, it may endow the agent with power to make findings of fact which are conclusive, provided the requirements of due process which are especially applicable to such an agency are met, as in according a fair hearing, and acting upon evidence and not arbitrarily."

Likewise, in *City of Seymour v. Texas Electric Service Co.*, 66 F. 2d 814 (C.C.A. 5), *(certiorari* denied 290 U.S. 685, 78 L.Ed. 590), it is said: "* * * In owning and operating a utility plant a city acts not in a governmental but in a proprietary capacity, (but) when the council, exerting the power to regulate, comes to fix rates it represents not the city, as proprietor, but the State, as regulator. It exerts not the contractual power of the city, but the sovereign power of the state." See also *Shirk v. Lancaster*, 313 Pa. 158, 169 A 557, 90 A.L.R. 688.

The Legislature has authorized a municipal corporation that owns a waterworks system to furnish water to any person, firm, or corporation outside its corporate limits, where the service is available. G.S. 160-255. Likewise, the Legislature has seen fit to adopt G.S. 160-256, which in pertinent part provides: "The governing body, or such board or body which has the management and control of the waterworks system in charge, may fix such uniform rents or rates for water or water service as will provide for the payment of the annual interest on existing bonded debt for such waterworks system, for the payment of the annual installment necessary to be raised for the amortization of the debt, and the necessary allowance for repairs, maintenance, and operation, and when the city shall own and maintain both waterworks and sewerage systems, including sewerage disposal plants, if any, the governing body shall have the right to operate such system as a combined and consolidated system, and when so operated to include in the rates adopted for the waterworks a sufficient amount to provide for the payment of the annual interest on the existing bonded debt for such sewerage system or systems, for the payment of the annual installment necessary to be raised for the amortization of such debt, and the necessary allowance for repairs, maintenance and operation. * * * Provided, however, that for service supplied outside the corporate limits of the city, the governing body, board or

body having such waterworks or lighting system in charge, may fix a different rate from that charged within the corporate limits * * *"

Unquestionably, the above statute contains ample standards to guide a municipality in exercising the delegation of authority to fix fair and just water rates. Moreover, Chapter 399 of the 1933 Public-Local Laws of North Carolina merely established separate classifications as between services supplied outside the corporate limits of the City of Asheville, "where the service is available," to persons, firms, and corporations not located within a water or water and sewer district, and to persons, firms, and corporations outside the corporate limits of the City of Asheville, whose property is now connected or may hereafter be connected with the main of any water district which has paid or issued bonds for the payment of the expense of constructing such water or water and sewer system.

The Legislature by adopting the above Act did not establish the rates to be charged to consumers in the water or water and sewer districts involved, although it had the right to do so; but it did direct the City of Asheville not to charge rates to the persons, firms, and corporations in these districts in excess of the rate or rates fixed from time to time by the governing body of the City of Asheville to be paid by persons, firms, and corporations within the corporate limits of the City. The governing body of the City of Asheville is free to raise or lower its present rates if in its judgment the rates are too high or too low.

This Court has heretofore held that Section 4, Article VIII, of our Constitution does not forbid the Legislature from passing special acts, amending charter of cities, towns, and incorporated villages, or conferring upon municipal corporations additional powers, or restricting the powers theretofore vested in them. *Kornegay v. Goldsboro,* 180 N.C. 441, 105 S.E. 187; *Holton v. Mocksville,* 189 N.C. 144, 126 S.E. 326; *Webb v. Port Commission,* 205 N.C. 663, 172 S.E. 377; *Deese v. Lumberton,* 211 N.C. 31, 188 S.E. 857.

In *Kornegay v. Goldsboro, supra,* it is said: "The defendant is a public corporation and section 1 of Article VIII 'would seem clearly to have reference to private or business corporations, and does not refer to public or *quasi*-public corporations acting as governmental agencies.'" *Mills v. Commissioners,* 175 N.C. 215, 95 S.E. 481.

The Court, in this same case, in discussing the validity of the special act under consideration, said: "* * * Is it not clear that the true intent of the last section (section 4 of Article VIII) is to impose the duty of passing general laws relating to cities

and towns, leaving it to the discretion of the legislature to enact special acts as the needs of the municipalities may require?" The Court then continues: "The reason for making this distinction is that the needs of the different communities are so diverse that no legislature could foresee the emergencies that would arise in different localities or the necessity for additional powers dependent on changing conditions, and could not provide for them by general legislation, and the present case is an apt illustration of the wisdom of this course."

In the case of *Holton v. Mocksville, supra, Conner J.,* speaking for the Court, said: "Section 4 of Article VIII of the Constitution imposes upon the General Assembly the duty to provide by general laws ·for the improvement of cities, towns and incorporated villages. It does not, however, forbid altering or amending charters of cities, town and incorporated villages or conferring upon municipal corporations additional powers or restricting the powers theretofore vested in them. We find nothing in section 4, Article VIII of the Constitution rendering this act unconstitutional, nor does the act relate to any of the matters upon which the General Assembly is forbidden by section 29 of Article II to legislate. *Kornegay v. Goldsboro,* 180 N.C. 441."

In our opinion, since a municipality has no legal right either in its governmental or proprietary capacity to sell water to consumers residing outside its corporate limits without legislative authority, the Legislature has the power to fix the terms upon which such sales shall be made; provided, such terms permit the establishment of a rate or rates which will be fair and just to the consumer and will produce a proper return to the municipality.

In the instant case, it will be presumed that the City Council of the City of Asheville acted in good faith in establishing water rates for its own consumers residing within its corporate limits and that it based the rates on the provisions contained in G.S. 160-256. There is nothing on this record which tends to show that the rate or rates to be charged the consumers in these water or water and sewer districts are unjust and confiscatory.

It is clear, under the facts disclosed on this record, that every purchaser of water in these water or water and sewer districts, from the City of Asheville, at the rates fixed for consumers of water within the city limits of Asheville, are paying as much of the debt service and interest, as well as the cost of operating, repairing, and maintaining the water and sewer systems of the City of Asheville, as any resident of the City who purchases a like amount of water. Moreover, in addition thereto, the persons, firms, and corporations in these water or water and sewer dis-

tricts are being taxed to pay the debt service, including interest on bonds issued to construct the water or water and sewer system in these respective districts, as well as taxing themselves for the repair and maintenance of such water or water and sewer system. Asheville contributed nothing to the construction of these systems, neither does it contribute anything to the cost of repairing and maintaining them. Asheville renders no service except to pump the water into the water systems, read the meters, which it did not furnish and does not service, and to bill the consumers.

It further appears from the record that a little over twenty-eight per cent of the meters through which the City of Asheville furnishes water are outside its corporate limits and the City derives a little over twenty-seven per cent of its total income from its water system from these outside consumers.

In our opinion, in light of all the facts and circumstances revealed on this record, the Legislature had the power to enact Chapter 399 of the Public-Local Laws of 1933, and that such Act is constitutional and valid and is binding on the City of Asheville insofar as it pertains to the right to sell water to persons, firms, and corporations who obtain water through mains constructed and maintained at the expense of the taxpayers in these water or water and sewer districts. We further hold that such Act does not violate Section 17, Article I, of the Constitution of North Carolina, or the Fourteenth Amendment to the Constitution of the United States.

The City of Asheville, however, still has the right to establish a different rate for service outside its corporate limits to persons, firms, and corporations not located or residing in a district that has constructed and maintained at its own expense its water or water and sewer system. *Construction Co. v. Raleigh,* 230 N.C. 365, 53 S.E. 2d 165; *Fulghum v. Selma,* 238 N.C. 100, 76 S.E. 2d 368. In *Construction Co. v. Raleigh, supra,* we held that in the absence of any constitutional or statutory restriction the rates and fees that may be charged to residents outside the corporate limits of a city or town are matters to be determined by its governing body in its sound discretion. It is optional with the City of Asheville as to whether or not it will continue to furnish these districts with water, but if it does do so, it must do so on the prescribed terms. Furthermore, the City is not authorized to contract for the sale of water to outside consumers except with respect to its surplus water.

The appellee contends the statute is unconstitutional because it provides that it shall be unlawful for the City to sell its water to outside consumers above the rate established for consumers in-

side the corporate limits of the City. This contention is without merit. While ordinarily the violation of a regulation established by a rate-making body subjects the violator to a penalty, in many instances such violation is declared to be a misdemeanor. G.S. 60-6; G.S. 62-121.72 (3) ; G.S. 62-128.

We do not consider the case of *Missouri P. R. Co. v. Tucker*, 230 U.S. 340, 57 L.Ed. 1507, and similar cases cited by the appellee, as controlling on the facts in the present case. In those cases, the complaining party or parties had no voice in the establishment of the rates; nor were they given the right to be heard. Here, the complaining party was left free to fix the rate which the General Assembly directed should be the maximum rate to be charged where certain factors or conditions exist. Moreover, the complaining parties in the cases cited by the appellee were compelled by law to operate under the rate or rates promulgated. Such is not the case here. As we have heretofore pointed out, the City of Asheville is under no duty to sell water to consumers residing outside its corporate limits. *Fulghum v. Selma, supra*. However, under the facts revealed by the record, it would seem that the City, in view of its control of the sources of water in the area, does have a moral duty to furnish water to these districts.

On the second question posed, we hold that a municipality cannot be estopped from enforcing its legal ordinances or from contesting the validity of an act it deems unconstitutional. *Raleigh v. Fisher*, 232 N.C. 629, 61 S.E. 2d 897 and cited cases.

In light of the conclusions we have reached, we hold that Ordinance No. 383, enacted by the City Council of the City of Asheville, on 11 August 1955, is invalid insofar as it established a different rate or rates for persons, firms, and corporations within these water or water and sewer districts and the rate or rates established for persons, firms, and corporations within the City limits of Asheville. The Ordinance is valid insofar as it applies to persons, firms, and corporations outside the City of Asheville, but not within a district that has established and maintains, at its own expense, the water or water and sewer system.

The judgment of the court below is

Reversed.