Justice NEWBY
dissenting.
Throughout our history, when communities needed a governmental provision of water and sewer services, the General Assembly, by local act, would grant a local government unit the authority to act. Here the majority’s holding ignores this historic constitutional understanding of the plenary authority of the General Assembly to oversee local government subdivisions and create new ones when necessary. Our history and our constitution recognize this plenary authority is necessary because the General Assembly is uniquely situated to oversee local government *107 and address changing needs. Now the Court brings uncertainty as to whether there are any lawfully established water or sewer districts in North Carolina. Even assuming the legislation at issue is a local act, the legislature first gave the City of Asheville, and countless other municipalities across our State, its water district by local act. If it is unlawful to modify that district by local act, then it was unlawful to establish it by local act initially. The majority’s complicated analysis casts this Court in the ill-suited role of legislating which local governmental authorities shall govern various water and sewer services. Because the General Assembly exercises its plenary authority in creating a water and sewer district, its action is constitutional. Accordingly, I respectfully dissent.
This Court presumes that legislation is constitutional absent an express constitutional prohibition on the legislature’s otherwise plenary police power and until its unconstitutionality is plainly and clearly demonstrated beyond a reasonable doubt. E.g., Hart v. State, 368 N.C. 122, 126, 774 S.E.2d 281, 284 (2015); see also Kornegay v. City of Goldsboro, 180 N.C. 441, 445, 105 S.E. 187, 189 (1920) (“[CJourts always presume[,] in the first place[,] that the act is constitutional... [and] that the Legislature acted with integrity and with an honest purpose to keep within the restrictions and limitations laid down by the Constitution.” (quoting Lowery v. Bd. of Graded Sch. Trs., 140 N.C. 33, 40, 52 S.E. 267, 269 (1905)). The presumptive constitutional power of the General Assembly to act is consistent with the principle that a restriction on the General Assembly is in fact a restriction on the people. See Baker v. Martin, 330 N.C. 331, 336-37, 410 S.E.2d 887, 890 (1991). Thus, this Court is powerless to review an act of the people through the General Assembly for its political propriety so long as it reasonably relates to the need sought to be remedied and falls within legislative discretion. Greensboro-High Point Airport Auth. v. Johnson, 226 N.C. 1, 8, 36 S.E.2d 803, 809 (1946).
The General Assembly has long enjoyed plenary power to create political subdivisions of local government,[1] and this authority has been *108 reaffirmed with each adoption of our state constitution. N.C. Const. art. VII, § 1; N.C. Const. of 1868, Amends, of 1875, ait. VII, § 14 (“The General Assembly shall have full power by statute to modify, change, or abrogate any and all of the provisions” pertaining to municipalities.); id., art. VIII, § 4 (“It shall be the duty of the Legislature to provide for the organization of cities, towns and incorporated villages ... .”); see also Report of the North Carolina State Constitution Study Commission 143 (1968) [hereinafter 1968 Constitution Commission Report] (recognizing “the General Assemblyfs] full power to revise or abolish the form and powers of county and township governments”).
The General Assembly creates governmental subdivisions to facilitate local self-government, dividing governing authority between local governmental units that may otherwise compete for jurisdiction. See Hailey v. City of Winston-Salem, 196 N.C. 17, 22, 144 S.E. 377, 380 (1928) (“When a new governmental agency is established by the Legislature, such as a municipal corporation, it takes control of all the affairs over which it is given authority, to the exclusion of other governmental agencies.”). Local governmental subdivisions are “parts and parcels of the State, organized for the convenience of local self-government,” People ex rel. Van Bokkelen v. Canaday, 73 N.C. 198, 222 (1875), which the General Assembly may create, organize, abolish, arrange, and rearrange to meet local needs. See also Town of Boone v. State, _ N.C._, _, _ S.E.2d _, _ (2016) (No. 93A15-2); Holmes v. City of Fayetteville, 197 N.C. 740, 746, 150 S.E. 624, 627 (1929) (recognizing municipalities as “mere instrumentalities of the State for the more convenient administration of local government”), appeal dismissed per curiam, 281 U.S. 700, 50 S. Ct. 353, 74 L. Ed. 1126 (1930).
Moreover, the legislature can create “separate corporate agencies] to serve [ ] particular governmental purposes” and “call upon them to perform such functions as the Legislature may deem best.” Johnson, 226 N.C. at 9-10, 36 S.E.2d at 809 (citing Brockenbrough v. Bd. of Water Comm’rs, 134 N.C. 1, 17, 46 S.E. 28, 33 (1903)). “A municipality acting in its governmental capacity is an agency of the State for the better government of those residing within its corporate limits . . . .” Candler v. City of Asheville, 247 N.C. 398, 406, 101 S.E.2d 470, 476 (1958); see also McCormac v. Commr’s of Robeson Gty., 90 N.C. 441, 444 (1884) (“[I]t is within the power and is the province of the legislature to . . . invest the inhabitants .. . with corporate functions, more or less extensive and varied in their character, for the purposes of government....”). The General Assembly is the political body designated to oversee local government and to make necessary modifications as local conditions *109 change. In organizing local government, and making necessary modifications, the General Assembly must weigh competing local interests and needs. Ultimately, the legislature alone must determine the propriety of changes in local government by exercising its political judgment.
This broad historic power of the General Assembly, acknowledged by our case law, has remained unchanged and is now expressly incorporated into Article VII, Section 1 of our current constitution, adopted in 1971:
The General Assembly shall provide for the organization and government and the fixing of boundaries of counties, cities and towns, and other governmental subdivisions, and, except as otherwise prohibited by this Constitution, may give such powers and duties to counties, cities and towns, and other governmental subdivisions as it may deem advisable.
N.C. Const, art. VII, § 1. As such, Article VII, Section 1 “is not a delegation of power to the General Assembly” but “a general description” and “merely a recognition” of “the General Assembly’s power to provide for the organization and powers of local government,” 1968 Constitution Commission Report 85, as affirmed in the 1875 amendment, which “gave the General Assembly full power to revise or abolish the form and powers of county and township governments,” id. at 143.
By its plain meaning, the text of the first clause, “ [t]he General Assembly shall provide for the organization and government and the fixing of boundaries of counties, cities and towns, and other governmental subdivisions,” mandates the statutory creation and structuring of local governmental subdivisions. See State v. Webb, 358 N.C. 92, 97, 591 S.E.2d 505, 510-11 (2004) (The constitution is construed for its plain meaning.); see also Dunn v. Pac. Emp’rs Ins. Co., 332 N.C. 129, 134, 418 S.E.2d 645, 648 (1992) (Ordinary rules of grammar apply.). “Organization” means something “put together into an orderly, functional, [and] structured whole.” Organize, The American Heritage Dictionary 926 (new coll, ed. 1979). “Government” is defined as “[t]he act or process of governing; especially, the administration of public policy in a political unit; political jurisdiction.” Government, id. at 570. The “fixing of boundaries” means establishing borders or limits. See Fix and Boundary, id. at 497, 156. “Other governmental subdivisions” includes a “special-purpose district or authority,” Local Government, Black’s Law Dictionary (10th ed. 2014), such as an administrative water district, operated in compliance with principles, rules, and regulations, see id. (listing examples of local *110 government units). Thus, the plain meaning of the phrase “organization and government and the fixing of boundaries” embraces the creation, expansion, retraction, and dissolution of all forms of local government, including “other governmental subdivisions.”[2]
Our case law has historically treated “other governmental subdivisions” similarly to traditional political subdivisions. See Town of Saluda v. Polk County, 207 N.C. 180, 186, 176 S.E. 298, 301-02 (1934) (“[T]he legislature alone can create, directly or indirectly, counties, townships, school districts, road districts, and the like subdivisions,... to effectuate the purposes of the government.... Such organizations are intended to be instrumentalities and agencies employed to aid in the administration of the government, and are always under the control of the power that created them, unless the same shall be restricted by some constitutional limitation.” (quoting McCormac, 90 N.C. at 444-45)); see also N.C.G.S. § 162A-65 (2015) (defining “political subdivision” for purposes of water and sewer authorities as “any county, city, town, incorporated village, sanitary district, water district, sewer district, special purpose district or other political subdivision,” id. § 162A-65(a)(8), and “governing body” as “the board, commission, council or other body... of a political subdivision in which the general legislative powers ... of such political subdivision are exercised,” id. § 162A-65(a)(6)). As such, the text of the first clause of Article VII, Section 1 contemplates the legislative creation of local governmental subdivisions, along with counties, cities, and towns, without constitutional limitation.
The second clause of Article VII, Section 1 concerns the authority of the General Assembly to confer specific “powers and duties” on local governmental units. Unlike the first clause, the second clause in Article VII, Section 1 includes an express limitation; namely, it prohibits any legislative delegation of “powers and duties” to local governmental units that is “otherwise prohibited by this Constitution.” Only under the second clause, then, is the General Assembly’s authority over local governments expressly subject to limitations imposed by other constitutional provisions, including the constraints on local acts listed in Article II, Section 24 first adopted in 1917. For example, under the Article II, Section 24 prohibition on certain local acts, the General Assembly cannot grant to one county the power to enact local employment legislation, *111 see Williams v. Blue Cross Blue Shield of N.C., 357 N.C. 170, 191, 581 S.E.2d 415, 430 (2003), or remove a city’s power to enforce certain ordinances regarding specific properties within its municipal limits, see City of New Bern v. New Bern-Craven Cty. Bd. of Educ., 338 N.C. 430, 442, 450 S.E.2d 735, 742 (1994).[3] See also Town of Boone, _ N.C. at _, _ S.E.2d at _.
The question before this Court is whether the legislation at issue, Act of May 2, 2013, ch. 50, 2013 N.C. Sess. Laws 118 (the District Act), which creates a new regional district to govern water and sewer services within certain areas of Buncombe and Henderson Counties, is an exercise of the General Assembly’s plenary authority to “provide for the organization and government and the fixing of boundaries” of local government under the first clause of Article VII, Section 1 or whether it confers specific “powers and duties” on a local governmental unit under the second clause. If the General Assembly’s action creating the regional water and sewer district arises under its plenary authority recognized in the first clause of Article VII, Section 1, the analysis ends, and there is no need to address the application of the second clause and any restrictions imposed by Article II, Section 24.
As admitted by the City, the District Act creates a new political subdivision. Moreover, the statutory text of the District Act provides for *112 the organization and government of that new political subdivision. The stated purpose of the District Act is to enhance services to users by creating a regional water and sewer system to “provide reliable, cost-effective, high-quality water and sewer services.” Ch. 50,2013 N.C. Sess. Laws at 118 (emphasis added). Creating this type of local governmental subdivision to enhance water and sewer services falls squarely within the legislature’s plenary power as described in the first clause of Article VII, Section 1, and thus the District Act is constitutional.
Initially established by local act in 1883, the City’s public water “system currently serves approximately 124,000 customers, some 48,000 of whom are located outside Asheville’s city limits” in portions of Buncombe and Henderson Counties. See N.C.G.S. § 160A-312(a) (2015) (authorizing a city to operate a water supply and distribution system inside and “outside its corporate limits, within reasonable limitations”). In 2013 the General Assembly created a new local governmental subdivision to provide regional water and sewer services to the City and those portions of Buncombe and Henderson Counties. Ch. 50, 2013 N.C. Sess. Laws 118 (captioned “An Act to Promote the Provision of Regional Water and Sewer Services by Transferring Ownership and Operation of Certain Public Water and Sewer Systems to a Metropolitan Water and Sewerage District.”).
The “transfer provision” regionalizes water and sewer services by combining the City’s public water system with the Metropolitan Sewerage District operating in the same county to form a new governmental subdivision. The transfer provision provides in part: “All assets, real and personal, tangible and intangible, and all outstanding debts ... are by operation of law transferred to the metropolitan sewerage district operating in the county where the public water system is located, to be operated as a Metropolitan Water and Sewerage District.Id., sec. 1(a), at 118. All assets and all outstanding debts of both the City’s water system and the Metropolitan Sewerage District transfer to the new regional district. Id., sec. 1(b)-(c), (f), at 119.[4] The transfer between the City and the Metropolitan Sewerage District occurs by operation of law[5] because both systems operate in the same county and meet certain criteria. See id., sec. 1(a)-(f), at 118-19.
*113 By its terms and stated purpose, the District Act creates a regional governance solution for water and sewer systems and defines a “metropolitan water and sewerage district” as apolitical subdivision and deems it “a public body... exercising ... essential governmental functions to provide for the preservation and promotion of the public health and welfare.” Id., sec. 2, at 121.[6] The newly created regional district combines the authority of the previously separate water and sewer districts “[t]o do all acts and things necessary or convenient to carry out the powers granted by this Article.” Id. at 122. Overall, the regional district operates with the same power as a city in enforcing its ordinances, and the district board may not privatize its water and sewer services. See id.
Likewise, the District Act amends N.C.G.S. § 162A-85.3 to provide for the organization and governance of metropolitan water and sewerage districts like the one created here, including a governing board with regional representation. Id. at 120-21.[7] The District Act requires *114 the regional district board to work with local municipalities under its jurisdiction for the benefit of the district.[8] The district board performs administrative tasks such as fixing rates, fees, rents, and other charges for the services furnished or to be furnished by the district water and sewer system. See id. at 122 (“Such rates, fees, and charges may not apply differing treatment within and outside the corporate limits of any city or county within the jurisdiction of the district board” and “shall not be subject to supervision or regulation by any... agency of the State or of any political subdivision.”). In sum, as admitted by the City, the act creates a new “governmental subdivision” and provides for the “organization and government” thereof.
The broad constitutional authority acknowledged in the text of the first clause of Article VII, Section 1 clearly affirms the legislature’s ability to create and organize political subdivisions to meet changing needs, resolve disputes between local governments, and provide new governance solutions. The General Assembly’s constitutional authority to do so remains even if its solution combines, divides, or regional-izes the political power of preexisting subdivisions that once governed local issues. Here it seems the General Assembly, in its discretion and in accordance with the District Act’s stated purpose, finds regional governance over certain water systems will ensure high quality water and sewer services.
The role of the legislature is to balance the weight to be afforded to disparate interests and to forge a workable compromise among those interests. The role of the Court is not to sit as a super legislature and second-guess the balance struck by the elected officials . . . [but] only to measure the balance struck by the legislature against the required minimum standards of the constitution.
Henry v. Edmisten, 315 N.C. 474, 491, 340 S.E.2d 720, 731 (1986). The General Assembly’s policy decision here falls within legislative discretion and, as an exercise of legislative authority under the first clause of *115 Article VII, Section 1, does not implicate the constitutional constraints described in Article II, Section 24.
Assuming the District Act is a local act[9] as held by the majority, notably the legislature first created a water district for Asheville by local act.[10] When creating and organizing political subdivisions under its plenary power as recognized in the first clause of Article VII, Section 1, the *116 legislature often must address the local needs and competing political pressures of a geographic area. See Town of Boone, _ N.C. at _, __ S.E.2d at_. If, as the majority declares, creating and organizing a new water and sewer district is unconstitutional, would not the original act establishing Asheville’s water district also be unconstitutional? The need to organize water and/or séwer systems arose in localities across the state at different times. The General Assembly authorized various units of local government or created new ones to meet those needs as they arose or changed. Under the majority’s reasoning, all of the locally legislated and similarly empowered districts would have been illegally created.[11] If the creation of a local governmental subdivision, as in the District Act, is scrutinized under the second clause of Article VII, Section 1, all such water and sewer districts would receive the same review if challenged, and would be struck down as prohibited local acts. Moreover, the majority, in contravention of our heightened standard for reviewing the constitutionality of legislative acts, presumes the legislature enacted the District Act in bad faith and that its enactment will result in poor local governance. See Komegay, 180 N.C. at 446, 105 S.E. at 189 (presuming “the Legislature acted with integrity and with an honest purpose to keep within the restrictions and limitations laid down by the Constitution”).
The General Assembly is the only body politic with the oversight and authority to create and organize local political subdivisions in its discretion. It alone has the ability to resolve local governance disputes such as those undergirding the litigious past of the water system at issue.
Spanning almost a century, legislation and litigation chronicle the strained relationship between the City of Asheville’s water system *117 and its County water customers. See Act of Apr. 28, 1933 (Sullivan I), ch. 399, 1933 N.C. Pub.-Locai [Sess.] Laws 376 (captioned “An Act to Regulate Charges Made by the City of Asheville for Water Consumed in Buncombe County Water Districts”); Candler, 247 N.C. at 411, 101 S.E.2d at 479 (recognizing the legislature’s power to prevent by statute the City of Asheville from charging certain county residents higher rates than it charged to city residents). After several amendments and rein-statements of the joint agreement between the City and the County that was first established in 1981, that agreement ended in 2004, ultimately leaving the City with ownership and control of the water system. Again, it seems the parties soon after resorted to the legislature and the courts. See Act of June 29, 2005 (Sullivan II), ch. 140, 2005 N.C. Sess. Laws 244 (captioned “An Act Regarding Water Rates in Buncombe County”); Act of June 29, 2005 (Sullivan III), ch. 130, 2005 N.C. Sess. Laws 243 (captioned “An Act Regarding the Operation of Public Enterprises by the City of Asheville”); City of Asheville v. State, 192 N.C. App. 1, 36-37, 665 S.E.2d 103, 128 (2008) (finding that a local act addressing equitable rates “principally contemplate[d]” and “relate[d] only to matters which are purely economic in nature . . . rather than prioritizing the system’s health or sanitary conditions”), appeal dismissed and disc. rev. denied, 363 N.C. 123, 672 S.E.2d 685 (2009). The plenary power of the General allows it, not the courts, to craft a resolution of this matter.
As acknowledged in the first clause of Article VII, Section 1, the General Assembly has plenary authority, to establish new subdivisions of local government. The General Assembly alone can consider the local competing interests and craft a solution. Such legislative action is not conditioned upon first providing a majority of this Court with satisfactory justification. Johnson, 226 N.C. at 8, 36 S.E.2d at 809 (“We have no power to review a statute with respect to its political propriety as long as it is within the legislative discretion and has a reasonable relation to the end sought to be accomplished.”). The majority’s holding that a new political subdivision addressing regional problems with the water system violates Article II, Section 24 simply because the legislation involves a water system erases the General Assembly’s historic authority to establish convenient local governmental units acknowledged by the first clause of Article VII, Section 1. The General Assembly’s creating a new local governmental subdivision does not offend the state constitution. This Court should not weigh the wisdom or expediency of a legislative act. Accordingly, I respectfully dissent.
Chief Justice MARTIN joins in this dissenting opinion.

. Before its express inclusion in the 1868 state constitution, this Court recognized the General Assembly’s historic duty and plenary power to create and abolish political subdivisions of local government. See, e.g., White v. Comm’rs of Chowan Cty., 90 N.C. 437, 438 (1884) (County subdivisions “are indeed a necessary part and parcel of the subordinate instrumentalities employed in carrying out the general policy of the state in the administration of government... [and their functions] may be enlarged, abridged, or modified at the will of the legislature . . . [as] they are intended only to be essential aids and political agencies.”); see also Lilly v. Taylor, 88 N.C. 489, 494-95 (1883) (affirming the legislature’s creation and subsequent repeal of the charter of the Town of Fayetteville); Mills v. Williams, 33 N.C. (11 Ired.) 558, 563-64 (1850) (upholding the legislature’s “power to create and abolish” Polk County).

. See Town of Boone,_N.C. at_,_S.E.2d at_(Ervin, X, concurring in result) (“[T]he plain language in which the provision in question is couched suggests to me that ‘organization and government’ refers to the creation of units of local government and the manner in which those units of local government are governed....”).

. This approach of conducting an Article II, Section 24 analysis only when the challenged statute specifies a specific “power” or “duty” is consistent with our prior decisions. In Piedmont Ford Truck Sale, Inc. v. City of Greensboro, the plaintiffs challenged a local act annexing certain land to the City of Greensboro. 324 N.C. 499, 501, 380 S.E.2d 107, 108 (1989). While the annexation clearly arose under the authority to "fix the boundaries of cities” acknowledged in Article VII, Section 1, id. at 503, 380 S.E.2d at 110, because the act also contained a specific “provision regarding solid waste collection,” the plaintiffs argued the statute violated Article II, Section 24, id. at 504, 380 S.E.2d at 110. Because the statute specified a particular “power,” this Court conducted an analysis under-Article H. Id. at 504-06, 380 S.E.2d at 110-11. When viewed as a whole, the explicit grant of power was a “small part” of the legislation, id. at 506,380 S.E.2d at 111, and this Court concluded that “[t]he provision... regarding solid waste collection” did not violate Article n, Section 24, id. at 506, 380 S.E.2d at 111. See also, e.g., Lamb v. Bd. of Educ., 235 N.C. 377, 379-80, 70 S.E.2d 201, 203 (1952) (concluding that an act expressly restricting certain express powers of the Randolph County Board of Education violated the Article It limitations on local acts); Idol v. Street, 233 N.C. 730, 733, 65 S.E.2d 313, 315 (1951) (concluding that an act that “conferred] power upon the Board of Aldermen of the City of Winston-Salem and the Board of Commissioners of Forsyth County” to, inter alia, “name a joint city-county board of health,” which varied from general law, “[wa]s a local act relating to health” in violation of the Article II limitations on local acts); Bd. of Health v. Bd. of Comm’rs, 220 N.C. 140, 143-44, 16 S.E.2d 677, 678-79 (1941) (concluding that an act removing from the Nash County Board of Health the power to appoint a county health officer was a local act relating to health in violation of the Article II limitations on local acts).

. “All necessary permits for operation” are also “transferred to the Metropolitan Water and Sewerage District... to ensure that no current and paid customer loses services due to the regionalization of water and sewer services.” Id., sec. 1(e), at 119. Moreover, the General Trust Indenture, which governs the bonds issued and secured by a pledge of “[a]ll Net Revenues of the Water System,” contemplates a transfer “to another political subdivision or public agency in the State authorized by law to own and operate such systems.” The trustee allows a transfer “if such political subdivision... assumes all of the *113 obligations of the City under this Indenture” and if the transfer does not produce a “material adverse effect on the ability of the Water System to produce Revenues," on the bond rating, or with regard to tax treatment. These revenue bonds do not rely upon the City’s taxing power. See also Ch. 60, sec. 2,2013 N.C. Sess. Laws, at 122 (requiring that the rates and fees “pledged to the payment of revenue bonds” be sufficient to maintain the system).

. Governing bodies of other political subdivisions may establish regional systems by joint resolution. See Ch. 50, sec. 5.5, 2013 N.C. Sess. Laws, at 125 (requiring consent from county commissioners and all municipal governing boards affected before creation of district).

. The District Act amended the definitions of “unit of local government” and “municipality” to include “metropolitan water and sewerage districts” and added “metropolitan water and sewerage districts” to the fist of political subdivisions that may borrow money and issue bonds. Ch. 50, sec. 2, 2013 N.C. Sess. Laws, at 119-20; see also N.C.G.S. § 159-44(4) (2015) (defining a “unit of local government”); id. § 159-48(e) (2015) (borrowing and bond issuing); id. § 159-81(1) (2015) (defining a “municipality”); id. § 159-81(3) (2015) (revenue-bond issuing).

. Generally, the District Act requires that the apportionment of members on the district board be representative of the area serviced while considering population. See Ch. 50, sec. 2, 2013 N.C. Sess. Laws, at 120 (two from each county served); id. (one from each municipality served); id. (two from each municipality served with a population greater than 200,000); id. (one from each county served with a population greater than 200,000); id. (“One individual from a list submitted by the governing body of a county in which a watershed serving the district board is located in a municipality not served by the district. . . .”); id., at 121 (“One individual by the governing body of any elected water and sewer district wholly contained within the boundaries of the district.”). “[T]he district board may expand to include other political subdivisions if’ the additional political subdivision “become[s] a participant in the district board.” Id.
The District Act also sets terms for members and provides procedures for meetings, removal of members, filling vacancies on the district board, and the election and compensation of officers. Id. Until all appointments are made, the district board of the County’s *114 metropolitan sewerage district “shall function as the district board of the Metropolitan Water and Sewerage District.” Id., sec. 1(d), at 119.

. The District Act outlines the permissible authority for the local governing bodies within the regional district’s jurisdiction. See, e.g., Ch. 50, sec. 2, 2013 N.C. Sess. Laws, at 122-23 (regulating the transfer of jurisdiction from smaller systems to the regional district system for the benefit of the district, contracting with the district, revising rates or collecting taxes to pay obligations to the district, and submitting to its electors agreements with the district). When possible, the district board must coordinate with the local municipalities when constructing any system improvements. Id. at 123.

. The statutory definition of “local act” in reference to cities and towns “means an act of the General Assembly applying to one or more specific cities by name, or to all cities within one or more specifically named counties.” N.C.G.S. § 160A-1(5) (2016). The District Act does not refer to the City of Asheville by name.

. In 1883 the General Assembly appointed the Asheville Committee on Permanent Improvements as trustee to oversee a $20,000 fund provided for “water supply.” Act of Feb. 28, 1883, ch. 66, sec. 2,1883 N.C. Priv. [Sess.] Laws 752, 753. The legislature followed suit with other municipalities and subdivisions. E.g., Act of Mar. 11, 1889, ch. 219, sec. 105, 1889 N.C. Priv. [Sess.] Laws 899, 924 (appointing the Board of Alderman for City of Greensboro to manage and regulate “water-works” which “may be established, or land on which water-pipes are run to and from said works”); id. sec. 107, at 924 (same for “system of sewerage”); Act of Dec. 20, 1815, ch. XVII, sec. II, 1815 N.C. [Sess.] Laws 18, 18 (empowering and appointing City of Charlotte board of commissioners to “erect pumps or wells”).
The General Assembly revised the charter of the City of Asheville to provide for its water authority in 1901, conferring upon the Board of Alderman the power “[t]o provide a sufficient supply of pure water for said city, fix charges and rates therefor, and prescribe rules and regulations governing the use of same,” Act of Mar. 13, 1901, ch. 100, sec. 30, 1901 N.C. Priv. [Sess.] Laws 222, 232, which included “construction, operation, repair and control of such water-works," id., sec. 66, at 259. The legislature designated a separate subdivision of government, the Board of Health, to take “general charge and supervision of . . . the healthfulness of the water supply.” Id., sec. 32, at 234. In 1923 the General Assembly revised the charter and restructured the local government, empowering a Board of Commissioners to “build and construct” waterworks and sewerage systems, Act of Jan. 26, 1923, ch. 16, sec. 306, 1923 N.C. Priv. [Sess.] Laws 88, 154, both within the City limits and beyond, id., sec. 353, at 167, as well as a Commissioner of Public Works to supervise the systems, id., sec. 25, at 96.
In 1931 the legislature revised the charter again, which remains the charter today, subject to various amendments. Act of Mar. 30,1931, ch. 121, 1931 N.C. Priv. [Sess.] Laws 154. Under this charter, the General Assembly created a Department of Finance to take charge of “the supervision and control of and over the water system and supply,” id., sec. 32, at 161, and to “collect for the use of water,” id. at 163; see also Act of Apr. 6, 1951, ch. 618, 1951 N.C. Sess. Laws 554, 554 (allowing “the City of Asheville, Buncombe County and political units therein to contract” for the water system).
In 1981 the legislature expressly repealed these charter provisions related to the supervision and control of the water system, Act of Feb. 16,1981, ch. 27, sec. 3,1981 N.C. Sess. Laws 13,14, removing control from the Department of Finance and appointing anew political subdivision to handle the authority. In 1981 the City and Buncombe County then entered into a comprehensive local agreement that established, inter alia, an agency to administer the jointly-owned water supply and distribution systems.

. See, e.g., Act of June 29, 1967, ch. 1019, sec. 1, 1967 N.C. Sess. Laws 1463, 1463 (permitting the Town of Taylorsville and Alexander County to purchase a water system); Act of Apr. 5, 1961, ch. 560, secs. 1, 2, 1961 N.C. Sess. Laws 461, 461 (appointing Town of Dunn as new entity to acquire, build, manage, and operate the “water and sewerage system” for the “unincorporated village of Erwin in Harnett County”); Act of Apr. 5,1947, ch. 1040, sec. 3, 1947 N.C. Sess. Laws 1519, 1520 (creating a “Board of Power, Water and Airport Commissioners of the City of High Point... to construct, to improve, [and] to better... [the] water system”); Act of Jan. 30,1945, ch. 24, sec. 1,1945 N.C. Sess. Laws 37, 37 (moving all water-related property from the Board of Water Commissioners to the City of Charlotte, a separate corporation); Act of Jan. 18, 1939, ch. 1, sec. 1,1939 N.C. Pub.-Local [Sess.] Laws 11, 11 (establishing “sanitary districts” in Forsyth County); Act of May 3, 1935, ch. 418, sec. 1, 1935 N.C. Pub.-Local [Sess.] Laws 378, 378 (establishing joint water and sewer systems for Haywood County municipalities); Act of Jan. 26, 1923, ch. 1, sec. 1,1923 N.C. Priv. [Sess.] Laws 1, 1 (extending the “waterworks system” for the Town of Lenoir); Act of Jan. 1, 1917, ch. 71, sec. 2, 1917 N.C. Priv. [Sess.] Laws 134, 134 (establishing a separate entity, the Board of Water Commissioners, to “provide for the better management and proper operation of the ... water-works system of the city of Durham”).